# In the United States Court of Federal Claims

## OFFICE OF SPECIAL MASTERS

No. 13-647V

### Filed: September 27, 2016

NOT TO BE PUBLISHED

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

| | | |
|---|---|---|
| BOBBIE A. WINDHORST, | * | |
| | * | |
| Petitioner, | * | Finding of Fact; Onset; |
| v. | * | Chronic Inflammatory |
| | * | Demyelinating Polyneuropathy |
| | * | (CIDP). |
| SECRETARY OF HEALTH | * | |
| AND HUMAN SERVICES, | * | |
| | * | |
| Respondent. | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

*Barbara D. Bonar, B. Dahlenburg Bonar P.S.C., Covington, KY, for petitioner.*
*Claudia B. Gangi, U.S. Department of Justice, Washington, DC, for respondent.*

### RULING ON ONSET[1]

**Roth,** Special Master:

   On September 6, 2013, Bobbie A. Windhorst ["Ms. Windhorst" or "petitioner"] filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. § 300aa-10, *et seq.*[2] (the "Vaccine Act" or "Program").  The petition alleged that the influenza vaccination Ms. Windhorst received on September 8, 2010, caused her to suffer from chronic inflammatory demyelinating polyneuropathy (hereinafter "CIDP").  Petition at 1.

---

[1] Because this unpublished ruling contains a reasoned explanation for the action in this case, the undersigned intends to post it on the United States Court of Federal Claims' website, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services).  In accordance with Vaccine Rule 18(b), petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy.  If, upon review, the undersigned agrees that the identified material fits within this definition, the undersigned will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all "§" references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

During the pendency of this matter, petitioner filed several affidavits from herself as well as from multiple friends and family members.  In general, the facts presented in the affidavits differed significantly from each other and from the facts described in the medical records.  When special masters are confronted with discrepancies between medical records and affidavits, they are encouraged to hold a hearing to evaluate the testimony of the affiants.  *See Campbell v. Sec'y of Health & Human Servs.*, 69 Fed. Cl. 775, 779-80 (2006).

With this as the backdrop, a hearing was held in Louisville, Kentucky on February 23, 2016 to determine the onset of Ms. Windhorst's CIDP.  I heard testimony from Ms. Windhorst, Mr. Don Windhorst, Sr., Ms. Janet Lambert, and Mr. Don Windhorst, Jr.  This fact ruling is intended to clarify the onset of petitioner's illness and **must be given to each expert witness.  In writing their reports, the experts must rely on the factual findings contained in this Ruling,** which is focused on the events that transpired between September 8, 2010, when Ms. Windhorst received the allegedly causal influenza vaccine, and her diagnosis of CIDP in July of 2011.

Having carefully considered the affidavits and testimony, I find that the contemporaneous medical records and histories provided by petitioner to her medical providers closer in time to the events more accurately reflect petitioner's medical conditions.  Specific factual findings are set forth in detail below.  In summary, I find that petitioner did not begin displaying symptoms of her CIDP until, at the earliest, January of 2011, but more likely May or June of 2011, some eight or nine months post-vaccination.

## I.  Procedural History

Contemporaneously with filing the petition on September 6, 2013, petitioner filed her medical records (Petitioner's Exhibits, hereinafter "Pet. Exs." 2, 5-9), her affidavits (Pet. Exs. 1, 3), and an affidavit from her daughter, Ms. Janet Windhorst Lambert (Pet. Ex. 4).  Between August and October of 2014, petitioner filed additional medical records that had been requested by respondent (Pet. Ex. 10-26).  On December 11, 2014, respondent filed a Rule 4(c) Report (hereinafter "Rule 4 Report") stating that compensation was not appropriate.  Rule 4 Report, ECF No. 22.  After filing additional affidavits from petitioner and more medical records, petitioner filed a response to the Rule 4 Report, which stated that petitioner was attempting to obtain additional medical records in order to supplement the record.  Petitioner's Status Report ("Pet. S.R.") at 1, filed January 14, 2015.  Petitioner filed the additional medical records in March 2015, and expert reports from Dr. Vera Byers (Pet. Ex. 34), an immunologist, and Dr. Marcel Kinsbourne (Pet. Ex. 35), a neurologist, in September 2015.

This case was reassigned to me on October 22, 2015.  During a status conference on October 28, 2015, I ordered petitioner to submit supplemental expert reports addressing the issue of onset and requesting that each expert cite specifically the medical records upon which each relied as the basis of their opinions.  Order, issued Oct. 29, 2015, ECF No. 33.  I believed this to be necessary because it appeared that the experts relied mainly upon the facts as contained in the petitioner's affidavits and not on the medical records in this matter.  Petitioner submitted supplemental reports from both Dr. Byers (Pet. Exs. 44, 45) and Dr. Kinsbourne (Pet. Exs. 46,

47), as well as another affidavit from petitioner herself (Pet. Ex. 43).[3] The expert reports again relied heavily upon the facts as set forth in the affidavits.

After reviewing all of the filings in this case, I determined that there were factual discrepancies between the various affidavits of Ms. Windhorst, her daughter, Janet Windhorst Lambert (Pet. Ex. 4), and the contemporaneous medical records for visits Ms. Windhorst had with her medical providers between September 8, 2010 through July of 2011, when she was diagnosed with CIDP.  In order to resolve these discrepancies, I conducted a hearing in Louisville, Kentucky on February 23, 2016.

In anticipation of the hearing, petitioner was ordered to file affidavits from individuals whom she expected to testify and who could corroborate her account of the events that transpired in the fall of 2010.  Petitioner was directed to have her witnesses provide the evidence upon which they relied in order to recall those details now six years later.  Order, issued Feb. 3, 2016, ECF No. 39.  Eleven affidavits were filed; only four individuals testified at hearing.  Few provided any foundation for their ability to support petitioner's story, now six years prior.

Following the hearing, petitioner submitted additional medical records, notes, and photographs on March 25, 2016.  *See* Notice of Filing, Mar. 25, 2016, ECF No. 50.  Respondent filed her proposed findings of fact on April 8, 2016 (ECF No. 51), and petitioner filed hers on April 15, 2016 (ECF No. 54).  The proposed findings of fact outline the chronology of events between September 8, 2010 and Ms. Windhorst's diagnosis of CIDP.   The parties agree on the following: Ms. Windhorst received the allegedly causal flu vaccine on September 8, 2010, at a Walgreens Pharmacy in Louisville, Kentucky; she saw her primary care provider on November 8, 2010, to discuss hypothyroidism and hormone replacement therapy; while exercising on February 28, 2011, she experienced a strange sensation and then underwent cervical MRI; on April 7, 2011, petitioner had a consultation with a neurosurgeon; on May 16, 2011, petitioner underwent cervical spine surgery; by mid-June of 2011, petitioner experienced weakness in her lower body; and in July of 2011, petitioner consulted with a neurologist who ultimately diagnosed her with CIDP.  *See generally,* Respondent's Proposed Finding of Facts filed Apr. 8, 2016, ECF No. 51; Petitioner's Proposed Findings of Fact Regarding Onset, filed Apr. 15, 2016 (ECF No. 54).  The parties disagree on the following issues, which are the focus of the analysis below: when petitioner discontinued her use of Premarin cream (a hormone replacement medication); whether her use of Premarin was related to her leg pain; and whether petitioner experienced difficulties walking in the winter of 2010-2011.  *Id.*

## II. Findings of Fact

### A.  Legal Standards Regarding Fact Finding

Petitioners bear the burden of establishing their claims by a preponderance of the evidence. 42 U.S.C. § 300aa-13(1)(a).  A petitioner must offer evidence that leads the "trier of fact to believe that the existence of a fact is more probable than its nonexistence before [he or

---

[3] To date, petitioner has submitted a total of four affidavits in this matter.  *See* Pet. Exs. 1, 29, 43, and 50.

she] may find in favor of the party who has the burden to persuade the judge of the fact's existence." *Moberly v. Sec'y of Health & Human Servs.*, 592 F.3d 1315, 1322 n.2 (Fed. Cir. 2010) (citations omitted).

The process for making determinations in Vaccine Program cases regarding factual issues, such as the timing of onset of petitioner's alleged injury, begins with analyzing the medical records, which are required to be filed with the petition. 42 U.S.C. § 300aa-11(c)(2). Medical records created contemporaneously with the events they describe are presumed to be accurate and "complete" (i.e. presenting all relevant information on a patient's health problems). *Cucuras v. Sec'y of Health & Human Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993); *Doe/70 v. Sec'y of Health & Human Servs.*, 95 Fed. Cl. 598, 608 (2010)("[g]iven the inconsistencies between petitioner's testimony and his contemporaneous medical records, the special master's decision to rely on petitioner's medical records was rational and consistent with applicable law"). This presumption is based on the linked proposition that (i) sick people visit medical professionals; (ii) sick people honestly report their health problems to those professionals; and (iii) medical professionals record what they are told or observe when examining their patients in an accurate manner, so that they are aware of enough relevant facts to make appropriate treatment decisions. *Sanchez v. Sec'y of Health & Human Servs.*, No. 11-685V, 2013 WL 1880825, at *2 (Fed. Cl. Spec. Mstr. Apr. 10, 2013); *Cucuras v. Sec'y of Health & Human Servs.*, 26 Cl. Ct. 537, 543 (1992), *aff'd*, 993 F. 2d. 1525 (Fed. Cir. 1993)("[i]t strains reason to conclude that petitioners would fail to accurately report the onset of their daughter's symptoms. It is equally unlikely that pediatric neurologists, who are trained in taking medical histories concerning the onset of neurologically significant symptoms, would consistently but erroneously report the onset of seizures a week after they in fact occurred").

Where medical records are clear, consistent and complete, they should be afforded substantial weight. *Lowrie v. Sec'y of Health & Human Servs.*, No. 03-1585V, 2005 WL 6117475 at *20 (Fed. Cl. Spec. Mstr. Dec. 12, 2005). Indeed, contemporaneous medical records are generally found to be deserving of greater evidentiary weight than oral testimony—especially where such testimony conflicts with the record evidence. *Cucuras*, 993 F. 2d at 1528; *see also Murphy v. Sec'y of Health and Human Servs.*, 23 Cl. Ct. 726, 733 (1991), *aff'd*, 968 F. 2d 1226 (Fed. Cir.) *cert. den'd, Murphy v. Sullivan*, 506 U.S. 974 (1992)(citing *United States v. United States Gypsum Co.*, 333 U.S. 364, 396 (1947)("[i]t has generally been held that oral testimony which is in conflict with contemporaneous documents is entitled to little evidentiary weight")). In making contemporaneous reports, the declarant's motivation for accurate explication of symptoms is more immediate, as opposed to testimony offered after the events in question, which is considered inherently less reliable. *Reusser v. Sec'y of Health & Human Servs.*, 28 Fed. Cl. 516, 523 (1993).

However, there are situations in which compelling oral testimony may be more persuasive than written records—for instance in cases where records are deemed to be incomplete or inaccurate. *Campbell v. Sec'y of Health &Human Servs.*, 69 Fed. Cl. 775, 779 (2006)("like any norm based upon common sense and experience, this rule should not be treated as an absolute and must yield where the factual predicates for its application are weak or lacking."); *Lowrie*, 2005 WL. 6117475, at *19 ("[w]ritten records which are, themselves, inconsistent, should be accorded less deference than those which are internally

consistent")(quoting *Murphy v. Sec'y of Health & Human Servs.,* 23 Cl. Ct. 726, 733 (1991), aff'd per curium, 968 F. 2d 1226 (Fed. Cir. 1992)).  Ultimately, a determination regarding a witness's credibility is needed when determining the weight that such testimony should be afforded.  *Andreu v. Sec'y of Health & Human Servs.*, 569 F. 3d. 1367, 1379 (Fed. Cir. 2009); *Bradley v. Sec'y of Health & Human Servs.,* 991 F. 2d. 1570, 1575 (Fed. Cir. 1993).

When witness testimony is used to overcome the presumption of accuracy afforded to contemporaneous medical records, such testimony must be "consistent, clear, cogent and compelling." *Sanchez,* 2013 WL 1880825, at *3 (citing *Blutstein v. Sec'y of Health & Human Servs.,* No. 90-2808V, 1998 WL 408611, at *85 (Fed. Cl. Spec. Mstr. June 30, 1998)).  In determining the accuracy and completeness of medical records, the Court of Federal Claims has listed four possible explanations for inconsistencies between contemporaneously created medical records and later testimony: (1) a person's failure to recount to the medical professional everything that happened during the relevant time period; (2) the medical professional's failure to document everything reported to her or him; (3) a person's faulty recollection of the events when presenting testimony; or (4) a person's purposeful recounting of symptoms that did not exist.  *La Londe v. Sec'y of Health & Human Servs.*, 110 Fed Cl. 184, 203-204 (2013), *aff'd,* 746 F. 3d. 1334 (Fed. Cir. 2014).  In making a determination regarding whether to afford greater weight to contemporaneous medical records or other evidence, such as testimony at hearing, there must be evidence that this decision was the result of a rational determination.  *Burns by Burns v. Sec'y of Health & Human Servs.,* 3 F. 3d 415, 417 (Fed. Cir. 1993).

Despite the weight afforded medical records, special masters are not bound rigidly by those records in determining onset of a petitioner's symptoms.  *Villenzuela v. Sec'y of Health & Human Servs.,* No. 90-1002V, 1991 WL 182241, at *3 (Fed. Cl. Spec. Mstr. Aug. 30, 1991); *see also Eng v. Sec'y of Health & Human Servs.,* No. 90-175V, 1994 WL 67704, at *3 (Fed. Cl. Spec. Mstr. Feb 18, 1994) (explaining that §13(b)(2) "must be construed so as to give effect to §13(b)(1) which directs the special master or court to consider the medical records (reports, diagnosis, conclusions, medical judgment, test reports, etc.) but does not require the special master or court to be bound by them").

## B.  CIDP in General

CIDP is a demyelinating polyneuropathy characterized by "insidious onset, slow evolution (either steady progression or stepwise), and chronic course."  ADVERSE EFFECTS OF VACCINES: EVIDENCE AND CAUSALITY, Institute of Medicine (2012), p. 637.  Although more common in young male adults, it can occur at any age and to both sexes.  Its symptoms include tingling, numbness, weakness in the arms and legs, loss of reflexes, fatigue, and parasthesias, but not pain.  *Id; see also* DORLAND'S ILLUSTRATED MEDICAL DICTIONARY (32d ed. 2012) [hereinafter DORLAND'S], "Chronic Inflammatory Demyelinating P.," p. 1491.  Generally, chronic conditions are considered to have a slow progression and lengthy duration.  STEDMAN'S POCKET MEDICAL DICTIONARY (1987), p. 143.  There is no question that petitioner has CIDP.

## C.  Petitioner's Medical Records

Petitioner was born on September 22, 1938.  She was 71 years old on September 8, 2010, when she received the allegedly causal influenza vaccine at Walgreens in Louisville, Kentucky.

Before that date, petitioner reported, she frequently engaged in walking, socializing, exercising at her church and participating in family activities.  *See* Pet. Exs. 1, 29, 43, 50.  Her past medical history was significant for hyperlipidemia, hypothyroidism, osteoporosis, degenerative joint disease, cervical spine degenerative disc disease and stenosis, chronic dizziness and vertigo for at least ten years, and borderline diabetes since 2007.  Pet. Ex. 5 at 94; Pet. Ex. 18 at 3009-3029.

### i. Petitioner's Medical History Prior to the Flu Vaccine

Between 2000 and 2008, Ms. Windhorst was under the care of Dr. Basler, a primary care physician.  Ms. Windhorst had ongoing complaints of vertigo and dizzy spells, fatigue, left hip and leg discomfort or dysesthesia, and pain in her lower legs when walking.  *See generally* Pet. Ex. 18.  More specifically, she was diagnosed with myalgia of the lower extremities in 2001.  *Id.* at 3009-10.  In 2002, due to ongoing complaints of back and muscle pain as well as lower extremity pain when walking long distances, she underwent a series of tests, including sedimentation rate, blood test, and a DEXA scan to measure bone density.  *Id.* at 3012-14.  Results indicated that petitioner had osteoporosis.  An MRI was ordered due to complaints of chronic lower back pain.  *Id.*  On or about June 14, 2004, petitioner discontinued her use of Actonel, a medication used to slow bone loss and prevent fractures, due to her belief that it was causing joint pain, vertigo, dizziness, and arthralgias.  *Id.* at 3023.  To address her active neck and back problems, Dr. Basler referred petitioner to a neurosurgeon, Dr. Petruska, who examined her on November 18, 2004.  Dr. Petruska discussed surgical options for the cervical spine with petitioner, but they ultimately decided to pursue a more conservative therapeutic course.  Dr. Petruska recommended that petitioner attend physical therapy.  *Id*. at 3025-3065.

In August of 2008, Ms. Windhorst began seeing Dr. Villaroman as her primary care physician.  Dr. Villaroman documented petitioner's long standing complaints of dizziness, body aches, neck pain, change in speech, anxiety, and arthralgia.  She referred petitioner to Dr. Graham for bladder prolapse and advised petitioner to attend physical therapy for her other complaints.  Pet. Ex 5, p. 199-200.  On January 27, 2009, petitioner underwent bladder lift surgery and was then prescribed Premarin cream (a topical conjugated estrogen).  *See generally* Pet. Exs. 5, 28.  Petitioner continued her use of Premarin until sometime between March and June of 2010.  She read that it caused senility.  Tr. at 43.7-43.21; Pet. Ex. 29.  She noted that she was having memory issues.  Pet. Ex. 29.

Ms. Windhorst presented to Dr. Villaroman diligently every six months for routine blood work and follow-up of hypothyroidism, hyperlipidemia and borderline diabetes.  *See generally* Pet. Ex. 5.  She was sent for an EKG and chest x-ray on December 5, 2008 and a colonoscopy on December 18, 2008.  Pet. Ex. 5 at 50-54.  She presented to Dr. Villaroman on May 7, 2009, and November 5, 2009, for follow up and blood work for hypothyroidism and hyperlipidemia, for which she was taking Synthroid and Lipitor, respectively.  *Id.* at 94.  Dr. Villaroman noted that petitioner was using Premarin and that it was helpful.  *Id.* at 95, 104.  Petitioner had a routine visit with Dr. Villaroman on May 7, 2010.  *Id.* at 107.  She had a mammogram on June 17, 2010.  *Id.* at 108-112.

ii. **The Flu Vaccine and Petitioner's Subsequent Medical History**

On September 8, 2010, Ms. Windhorst received an influenza vaccine at a local Walgreens. Pet. Ex. 2. At this point, the medical records and petitioner's account of her medical conditions diverge significantly.

Ms. Windhorst did not see any medical provider again until November 8, 2010, when she presented to Dr. Villaroman for her routine six month visit. The medical record documents a "normal" physical examination. Pet. Ex. 5, p. 116. Specifically, the record states: "Hypothyroidism. Has been on HRT (Premarin cream) X 1 year, caused leg pain, memory issues. She D/C'd HRT- doing much better. Need TSH labs, needs meds refilled." Pet. Ex. 5, p. 116. The assessment was "[h]ypothyroidism, increased cholesterol, menopausal. Plan: Check CBC, CMP, Lipid Panel, TSH, Vitamin D, Scripts for Synthroid, Lipitor. Discussed with patient, diet, exercise, weight loss, advised. Pneumovax X 1. Return in 6 months." *Id.* Her blood work and lab results were normal. Pet. Ex. 5, p. 262.

On November 27, 2010, shortly after Thanksgiving, Ms. Windhorst presented to an urgent care facility complaining of a rash at her waist. Pet. Ex. 24, p. 1-3. She was noted to be taking thyroid medication, Lipitor, and Advil. She was diagnosed with Shingles. A physical examination conducted on that date was checked off as "normal." Pet. Ex. 24, p. 2-4. Shingles is believed to be an activation of latent herpes virus 3 in individuals who have become partially immune after a bout of chickenpox. Shingles is a painful rash that develops on one side of the face or body. It forms blisters that eventually scab over before clearing within two to four weeks. In addition to the rash, Shingles patients may experience fever, headache, chills, and upset stomach. Centers for Disease Control and Prevention, Shingles (Herpes Zoster), Signs & Symptoms, https://www.cdc.gov/shingles/about/symptoms.html (last visited July 6, 2016); *see also* DORLAND'S, "herpes zoster," p. 852.

Petitioner's next visit to any medical provider was on February 28, 2011, when she presented to Dr. Villaroman with arm weakness after working out with weights. Pet. Ex. 1, p. 3. Dr. Villaroman noted: "is losing strength in arms/hands x 2 months getting numb. Problem with weights, flash of heat in neck area during exercise. History of C-Spine Degenerative Disc Disease (DDD), S/P Shingles in right abdominal wall, no trauma or injury." Pet Ex. 5, p. 120. Petitioner was sent for an MRI of her spine, and Dr. Villaroman noted that she would refer her to a neurosurgeon if necessary. Pet. Ex. 5, p. 120-121; *see also* Pet. Ex. 48, p. 2.

On March 1, 2011, petitioner underwent an MRI of the cervical spine without contrast. Pet. Ex. 5, p. 123. The MRI revealed multiple levels of posterior disc protrusions or extrusions, with flattening of the ventral surface of the spinal cord from C3 through and including C7. There were severe bilateral neural foraminal stenosis along with moderate central spinal canal narrowing with the anteroposterior diameter of the spinal cord reduced to about 7 mm with flattening of the ventral surface of the spinal cord at C5-6. *Id.* She was referred to Dr. Harpring, a neurosurgeon. *Id.* at 126.

Five weeks later, on April 7, 2011, Ms. Windhorst presented to Dr. Harpring at the Neurosurgical Institute of Kentucky. Dr. Harpring noted that petitioner had been "complaining

of problems with her posterior cervical spine over the last few months" and was experiencing "interscapular pain." Pet. Ex. 27, p. 12.  He remarked that her primary complaint was "that her hands and arms have been staying numb" and that she had been dropping things.  *Id.*  He noted that "[n]othing seem[ed] to be making the numbness or weakness worse or better."  *Id.*  Dr. Harpring further noted that petitioner had "[n]o lower extremity problems with walking."  *Id.*

Upon physical examination, Dr. Harpring noted the following: "Back: examination of the posterior cervical spine reveals some slight tenderness to palpation towards the base, but no muscle spasm or guarding.  Relatively normal range of motion testing for her age with lateral rotation of the right and left, forward and backward extension.  Motor Strength:  slight grip weakness in both hands.  5/5 wrist dorsiflexion, biceps, triceps and deltoid muscles and finger intrinsics.  No sign of muscle atrophy.  Normal tone with range of motion testing.  Straight leg raise:  Negative straight leg raising test to 90 degrees bilaterally.  No pain with internal or external rotation of the right or left legs at the hip joint.  Negative FAVRE sign bilaterally. Station and Gait:  Normal…Impression:  chronic progressive posterior cervical pain and bilateral upper extremities constant numbness and tingling and some slight weakness secondary to the spur disc complex seen at C5-6, resulting stenosis.  I do not think the other minimal problems at the adjacent levels of C4-5 and C6-7 that is, is causing any significant problems."  Pet. Ex. 27, p.13.  Dr. Harpring recommended that petitioner undergo surgery due to developing weakness and "early myelopathy secondary to the problem seen at C5-6."  Pet. Ex. 27, p. 13.

Later that day, Ms. Windhorst was examined by Dr. Campbell, Dr. Harpring's associate. Dr. Harpring sought Dr. Campbell's expertise for "cervical plating."  Pet. Ex. 27, p. 57.  Dr. Campbell noted that Ms. Windhorst was "having some mild myelopathic changes, dropping things, fine motor skills, trouble with using her hairspray.  She has been diagnosed with central stenosis here at C5-6 region and scheduled to undergo operative intervention."  Pet. Ex. 27, p. 57.  Dr. Campbell remarked that petitioner "localize[d] the pain in the cervical region" and had good range of motion and motor strength.  Pet. Ex. 27, p. 57-58.  Dr. Campbell also noted that her sensation was "intact" and that she had "good reflexes."  *Id.*  Dr. Campbell concurred with Dr. Harpring that petitioner had "a spinal cord compression here with spondylosis here at 5-6 region."  Pet. Ex. 27, p. 57-58.

On May 5, 2011, Ms. Windhorst presented to Dr. Villaroman for pre-surgical clearance. Upon examination she was found to have normal gait and station and no misalignment, instability, muscle atrophy, or gross motor/sensory deficits.  Pet. Ex. 5, p. 244.

On May 11, 2011, petitioner underwent a stress test.  "Patient exercised for 3 minutes and 7 seconds on a Bruce protocol, achieving 95% of his [sic] age predicted maximum heart rate and a peak blood pressure of 168/100.  The test was terminated upon achieving targeted heart rate without chest pain.  No ST segment changes.  Impression: Asymptomatic, negative, submaximal exercise stress test with poor exercise tolerance." Pet. Ex. 5, p. 130-134.[4]  Her results were considered to be normal.  Pet. Ex. 5, p. 130-34.  Petitioner's blood work and urine analysis were

---

[4] The records of petitioner's stress test repeatedly use male pronouns.  However, petitioner's name is at the top of each form.  I am confident that these are petitioner's test results and that the male pronouns are just typographical errors.

for the most part normal, as were her chest x-ray and EKG.  Pet. Ex. 5, p. 135-145.  She was noted to have "no absolute contraindication for planned surgery."  Pet. Ex. 5, p. 146.

Ms. Windhorst underwent an anterior cervical discectomy and allograft bone graft fusion at C5-C6 on May 16, 2011.  Pet. Ex. 27, p. 17.  The medical chart noted that she had complained of a "long history of chronic, progressive posterior cervical pain and bilateral upper extremity numbness and tingling in her hands."  Pet. Ex. 27, p. 17.  Following surgery, she was noted to be awake and alert and stated that she felt "great," that her arms and hands felt better.  Pet. Ex. 27, p. 4296.  Upon examination her strength as well as lab results were noted as normal.  Pet. Ex. 27, p. 4296.  Petitioner remained in the hospital overnight and was discharged from the hospital the next day.  She was "doing great," with a normal voice and no significant pain.  Pet. Ex. 27, p. 4284.

On June 1, 2011, Ms. Windhorst presented to Dr. Villaroman.  She was doing well post-cervical spine surgery.  Pet. Ex. 5, p. 246.  She complained of right leg pain and weakness in her legs, with the left greater than the right.  *Id.*  She stated that she was having difficulty standing.  Despite this, her gait was noted to be stable and her motor strength was 5/5.  *Id.*  Dr. Villaroman ordered a CT scan of her lumbar spine.  *Id.*

The same day, Ms. Windhorst underwent the ordered CT scans of the lumbar spine and right and left hips.  Pet. Ex. 5, p. 153-157.  The results were essentially normal.  *Id.*; *see also* p. 161-162.  Blood work showed increased cholesterol, triglycerides and liver function.  Pet. Ex. 5, p. 158-159.

On June 15, 2011, petitioner went to Dr. Harpring for her follow-up visit.  Pet. Ex. 27, p. 4233-4234.  Dr. Harpring noted that petitioner was in for a post-operative visit 3 weeks post C5-6 decompression and fusion.  She was "doing quite well," though she still experienced "some residual numbness and tingling, mostly in her hands."  *Id.*  Dr. Harpring remarked that petitioner complained of some "bilateral lower leg weakness in the left leg being slightly worse than the right.  She states that it is hard for her to get from a sitting to a standing position.  She is no longer able to walk as far as she used to.  She is not complaining of any significant lower extremity pain, numbness and tingling.  She will get some achiness just at night time, only.  MRI showed L3-4 and L4-5 degenerative spondylosis, mild to moderate right greater than left neuroforaminal narrowing, and mild spinal stenosis."  *Id.*

Ms. Windhorst returned to Dr. Harpring for a follow-up visit on July 7, 2011.  She was noted to be seven weeks post-cervical surgery and was complaining of generalized weakness in the upper and lower extremities, which had progressively gotten worse since her surgery.  Pet. Ex. 27, p. 4231.  Petitioner reported that she had numbness and tingling in her hands and fingers that had worsened over time.  *Id.*  She also stated that she had difficulty walking "any distance and going up steps due to her weakness."  *Id.*  Dr. Harpring ordered an MRI of petitioner's brain out of concern for possible metabolic etiology or even a possible tumor, and referred her to a neurologist "to further investigate her symptomology."  Pet. Ex. 27, p. 4231-4232.  Petitioner's MRI of the brain was normal.  Pet. Ex. 8, p. 405.

On July 12, 2011, Ms. Windhorst was examined by a neurologist, Dr. Zakaria.  Pet. Ex. 11, p. 2187.  She was noted to be a 72 year old right-handed female with a past medical history "significant for hypothyroidism and possible diabetes, who presented for evaluation of progressive weakness in her lower extremities in addition to numbness of her upper extremities." *Id.*  Petitioner reported that in January of 2011, she started having progressive weakness of her legs, resulting in difficulty standing or sitting up.  *Id.*  Dr. Zakaria noted that she was able to walk without assistance.  Ms. Windhorst denied having any pain in her lower extremities.  Dr. Zakaria wrote that petitioner had "4+/5 weakness in her proximal leg muscles.  She also ha[d] 4+/5 weakness in her distant hand muscles, more severe on the left, especially in the innervated muscles.  Patient also ha[d] mild weakness in her deltoid muscles bilaterally in the range of 4+/5.  The rest of the exam showed muscle strength 5/5."  Pet. Ex. 11, p. 2188.  He also noted that she experienced "decrease pinprick and temperature sensation in both feet up to the knees, and in both hands up to the elbow."  *Id.*  She walked normally, without difficulty.  *Id.*  Dr. Zakaria suspected diabetic neuropathy but could not rule out other inflammatory myopathies.  He ordered electromyogram ("EMG") testing.  *Id.* at p. 2189.

Three days later, on July 15, 2011, Ms. Windhorst presented to the emergency room with a chief complaint of "weak in arms/legs x 6 months," onset noted as "worsening x 1-2 days."  It was noted that "pt was able to walk but having increasing difficulty standing from sitting…"   It was noted that Ms. Windhorst had cervical surgery and a stress test one month ago.  Pet. Ex. 11 at 2378.  Nursing assessment was "mild" distress.  Labs were normal.  Clinical impression was "generalized weakness."  *Id.* at 2379.  *See also* 2383-2384; 2396-2398.  Dr. Zakaria saw petitioner in the emergency room and noted: "patient was seen and examined, please refer to my note for more details, history of progressive weakness of lower ext. work up in progress, high arseic (sic) level in urine, of unknown significance. Will check 24 hour urine heavy metal exposure and do EMG next Friday.  I suspect CIDP. will also arrange for spinal tap next week."  *Id.* at 2385.  Ms. Windhorst was discharged the same day with direction for the follow up testing that had been ordered and to return if there was an increase or worsening of symptoms.  *Id.* at 2386-2387.

On July 19, 2011, Ms. Windhorst presented for the ordered lumbar puncture for numbness, weakness and questionable neuropathy.  The result showed "normal CSF Glucose > than 50% blood glucose, negative olig bands – CSF (Negative), Protein – CSF 104 H …" Pet. Ex. 11 at 2553-2561.

On July 22, 2011, Ms. Windhorst presented for EMG testing of the upper and lower extremities.  The test results were "markedly abnormal," with "evidence of chronic, mainly demyelinating acquired peripheral neuropathy" of the lower extremities.  Pet. Ex. 7, p. 350.  The EMG of the upper extremities indicated that petitioner had carpal tunnel syndrome on the right "with mild ongoing denervation."  *Id.*  She was at this time formally diagnosed with CIDP.  *Id.; see also* p. 352.

Ms. Windhorst was admitted to Brownsboro Hospital for IVIG treatment for CIDP.  She received multiple IVIG treatments thereafter, as well as prednisone with Cellcept, Mestinon and PLEX.  *See generally* Pet. Ex. 11.  After her weakness failed to resolve and she relapsed, Dr. Zakaria referred her to the Mayo Clinic.

On April 10, 2012, Ms. Windhorst presented to the Mayo Clinic. Ms. Windhorst described herself as physically active until mid-October of 2010. Pet. Ex. 12, p. 2485. She stated that she received a flu vaccine in September of 2010, following which she went on a trip to Turkey and noted that her left leg seemed to be dragging. She stated that she was in Turkey for two weeks and had difficulty climbing steps due to weakness of her left leg. Within six to eight weeks, she developed weakness of her right leg and by November was unable to walk even two blocks. *Id.* Petitioner reported that she developed Shingles around Thanksgiving. She recounted that in January or February of 2011 she was performing arm exercises and suddenly felt a hot sensation from her lower spine into her neck with tingling in her feet and hands. She had cervical surgery, but had no change in her symptoms. *Id.* At some point she started to get progressive weakness of her arms, eventually having difficulty even brushing her teeth. *Id.* She stated that she was wheelchair bound by the time she saw Dr. Zakaria in July of 2011 and he did extensive testing diagnosing her with CIDP and treated her with IVIG. She said that she felt better with the IVIG, but that it wore off. *Id.*

After extensive testing at the Mayo Clinic, Ms. Windhorst's diagnosis was as follows: Chronic inflammatory demyelinating polyradiculoneuropathy (CIDP); elevated blood sugar; history of remote Hepatitis B; Positive ANA, SS-A, GAD 65 and P/Q-type calcium channel antibodies. Pet. Ex. 12, p. 2519-2520. She continues to receive IVIG treatments on a regular basis.

## D.  The Petition and Affidavits

The Petition filed in this matter states that within a few weeks of receiving a flu shot on September 8, 2010, or on or about October 15, 2010, Ms. Windhorst noticed significant changes to her physical abilities and numbness in her left leg. Specifically, her left leg was dragging and her routine three mile walk became increasingly difficult. By December of 2010, she could no longer walk or engage in her regular functions of daily living. Petition, p. 2. Because petitioner filed multiple inconsistent affidavits, each will be summarized in turn.

### i. <u>Petitioner's First Affidavit</u>

In support of her Petition, Ms. Windhorst filed her first affidavit, stating that the September 2010 flu shot caused her tremendous pain and suffering and continues to do so. Pet. Ex.1, p. 1-2. Connected to that affidavit was a timeline in which Ms. Windhorst detailed the deterioration of her health beginning on October 15, 2010. She stated that at her visit with Dr. Villaroman on November 8, 2010, she complained about her left leg dragging, numbness, and exhaustion. One week later, both legs were very weak. She stated that she had to "sit on the stairs and scoot myself up to my bedroom. I continue[d] to be exhausted and the numbness was taking over." Pet. Ex. 1, p. 3.

Petitioner affirmed that by Thanksgiving, she was "off balance" and by December of 2010, she "couldn't walk anymore, I was having dizzy spells, my balance was off, I had to hold on to sturdy areas to move or walk for support, very weak. I continued to decline. December, Christmas time…[D]izzy, dropping objects/things because I'm getting weaker, I can't physically

take care of my home…My life stopped and I tried to survive…I continued to decline." Pet. Ex 1, p. 3.

Ms. Windhorst described an event in February of 2011, while lifting one pound weights, in which she experienced an extremely warm sensation from her "mid back up to what seemed to be the stem of my brain. It caused me to drop my weights, my hands and toes began to tingle and my fingertips became numb…I called Dr. Villaroman…she saw me immediately. My doctor checked me over and ordered an MRI of the cervical spine. I continued to decline." Pet. Ex. 1, p. 3. The MRI done in March showed a herniated disc and Ms. Windhorst presented to Dr. Harpring on April 7, 2011. Ms. Windhorst stated that Dr. Harpring "felt surgery would help my numb hands but not my lower extremities. I continued to decline." Pet. Ex. 1, p. 3. On May 16, 2011, she had cervical surgery which was successful, but within a few days the tingling and numbness were still present. Pet. Ex. 1, p. 4. On June 1, 2011, she "had another check up with Dr. Villaroman. We discussed the cervical surgery went well. But, my hands were still numb and my legs were still extremely weak. When I walked around the house I had to hold onto furniture or walls. I also have to take a nap every day due to my exhaustion. I have no energy at all…she ordered a CT of my lumbar…I continue to decline." Pet. Ex. 1, p. 4. Later that month, "Dr. Harpring said the surgery was healing well…I told him my legs were very weak and I need help to walk…He ordered an MRI…Early July…He couldn't see a reason for my weakness in my legs…Mid July 2011, I met with Dr. Zakaria, he sent me for many tests, July 22, 2011, I have to use a walker…Dr. Zakaria told me that I had acquired CIDP." Pet. Ex. 1, p. 5.

### ii. <u>Petitioner's Second Affidavit</u>

Eighteen months later, on March 2, 2015, a second affidavit was filed. In this affidavit, Ms. Windhorst stated that within five weeks of receiving the flu vaccine, she began "having pain and numbness in my limbs, and began dragging my left leg when I walked. I also noticed that I was suddenly having bouts of memory loss." Pet. Ex. 29, p. 4317. Petitioner affirmed that the only change her primary care physician had made to her health care plan was prescribing hormone replacement therapy, specifically Premarin. Pet. Ex. 29, p. 4318. Believing the Premarin to be the cause of her symptoms, petitioner discontinued its use. She stated that she told Dr. Villaroman that she had stopped using Premarin when she presented to her office on November 8, 2010. *Id.* Eventually, however, her symptoms "became unmanageable" and she experienced pain in other limbs. *Id.*

### iii. <u>Petitioner's Third Affidavit</u>

Eight months thereafter, on December 14, 2015, a third affidavit was filed. In this affidavit, Ms. Windhorst stated that in September of 2010, a few weeks after receiving her flu shot, she flew to Turkey. During the trip, she "noticed my legs were bothering me. Specifically, my left leg began aching during the flight to Turkey. The aching in my left leg did not go away. In or around mid-October, it was difficult to walk, my leg was dragging and I was feeling the same aching leg pain in my right leg. I started the use of Premarin after I had a bladder lift, or in or around January of 2009. I discontinued the use of Premarin in or around mid-March 2010." Pet. Ex. 43.

### iv. **Petitioner's Fourth Affidavit**

On February 12, 2016, two weeks before the hearing in this matter, a fourth affidavit was filed. In this affidavit, Ms. Windhorst stated that she went to Turkey from September 22, 2010 to October 6, 2010. Her legs started to bother her on the flight on September 22, 2010. "My legs were extremely uncomfortable, aching and in pain… After arriving in Turkey…took a 45 minute bus ride…I sat by a vacant seat to elevate my legs because they were very swollen and in pain…Throughout the entire trip, I had leg issues…My left leg was slightly worse than my right leg because it started to drag. The pain never went away." Pet. Ex. 50 at 1-2.

Petitioner reported that her symptoms did not resolve after she returned home on October 6, 2010. She already had an appointment with Dr. Villaroman scheduled for November 8, 2010, and decided to keep that appointment and ask her doctor about the problems with her legs at that time. She said that "[a]t first, my left leg was really dragging…I had to mentally focus on moving my legs and it took my every energy and effort to do so." *Id.* at 2.

Petitioner recounted an incident that occurred on October 15, 2010. She stated that "it was still very difficult for me to walk. I was walking on the sidewalks in my neighborhood and fell…I hit my face on the ground. I was bleeding, bruised and in pain. I made it to my feet and returned home all battered and my husband asked what had happened. I told him I fell and he helped me clean my injuries. My legs were numb, but I still continued to try to walk." *Id.* at 3.

Petitioner further stated that by the middle of October, she had become "very fatigued and started sleeping every afternoon. My naps were 2-3 hours long." *Id.* She said that on October 23, 2010, she and her husband attended a University of Louisville basketball game at the YUM Center Stadium. She was able to walk down to their seats, "but could not walk up the stairs to leave the game." *Id.*

Petitioner did not seek any medical attention until her routine doctor's visit on November 8, 2010. Petitioner stated that she drove herself to her appointment with Dr. Villaroman. According to Ms. Windhorst, "the primary purpose of the appointment was a follow up regarding the Premarin cream, which she had prescribed to me at my last visit for my hyperthyroidism. I had read the Premarin label and it disclosed that Premarin hadn't been tested on people over 65 and possibly caused dementia. Around this time, I had become more forgetful. I thought it was either the Premarin cream or the trip to Turkey that was causing my memory issues and my leg issues. I went to my appointment with Dr. Villaroman determined to let her know that I had discontinued the Premarin cream and that I would not go back on it. At the visit, I told Dr. Villaroman about my concern with the pain in my left leg, which was dragging, and also about the numbness and how I was always exhausted. She agreed to run a battery of blood tests. I was very relieved when they all came back normal a few days later." *Id.* at 3-4.

Petitioner reported that by mid-November 2010 she had numbness in her hands and legs. "The numbness started taking over. I started losing my balance and became dizzy. I am an avid reader, but by this time could no longer hold a book…I would have a few good days and then a couple of horrible days." *Id.* at 4.

On or about November 27, 2010 petitioner was diagnosed with Shingles.  She stated that "the holiday season of November to December of 2010 was very difficult…I could no longer cook because I was constantly dropping objects, having dizzy spells and having to hold on to things to even stand or walk…I continued to hope it was something temporary that would resolve…In mid December 2010 and through Christmas, I continued to lose strength…I couldn't raise my arms, I became dizzy often, I wasn't able to brush my teeth…I couldn't feed myself…My body was shutting down…Mid December 2010 (before Christmas), I remember seeing a bug on the floor at my home.  When I went to step on the bug, I fell…My body just dropped and fell to the ground.  I couldn't stand up.  I had to yell to my husband to come to help me standup…I also remember during this time period trying to get dressed and falling.  My husband once again had to get me up…I was confused and alarmed."  *Id.* at 5.

Because of her failing health, petitioner affirmed that "[o]n February 1, 2011, my husband and I bought a ranch house so I could be on one floor.  My husband and children painted, installed handles, door handles, faucets.  My family helped design the interior and worked with contractors to renovate the bathrooms and kitchen with handicap handles to accommodate my newly acquired disabilities."  *Id.* at 6.  She recalled that on February 8, 2011, while sitting in a chair exercising with weights, she "felt a very hot sensation in my spine all the way what seemed like my brain, I felt like I was paralyzed.  My arms dropped to my sides.  I was dizzy, scared and my legs wouldn't move.  My hands and toes tingled and my fingertips were numb.  I waited and waited until I felt I could move.  I called Dr. Priscilla Villaroman and she saw me that day and ordered an MRI of the cervical spine."  *Id.*  Petitioner stated that "[b]y February 2011, I was exhausted every afternoon, requiring lengthy daily naps."  *Id.*  She said that "from September 2010 to the spring of 2011, I had strings of good days, and each time I kept hope that I was returning to my normal health and that my condition was only temporary.  Because of the good days, I often delayed seeking medical care hoping my issues had passed for good."  *Id.* at 7.

### v. Janet Lambert's First Affidavit

Janet Windhorst Lambert, the petitioner's daughter, submitted an affidavit and timeline in support of the Petition on September 6, 2013.  Ms. Lambert provided the definition of CIDP and stated that at the Mayo Clinic, her mother's doctor described Ms. Windhorst as "a trauma injury case which is documented by health records of Bobbie Windhorst who had excellent health throughout her life then suddenly her health deteriorates and falls immediately following a trauma injury of a flu injection in 2010…the trauma injury of the 2010 flu shot injection brought about many rapid physical and mental changes starting with immediate pain in mom's left leg.  It became extremely painful for my mother to walk."  Pet. Ex. 4-A at 1.

Ms. Lambert recounted a particularly memorable birthday lunch with her mother on February 25, 2011.  She "immediately noticed [petitioner] was having difficulty gripping her utensils.  We talked about it and she said 'well, dad helped me get ready today he washed and brushed my hair and helped me get dressed'…an MRI validated there was a herniated disc that could cause the arms, hands and fingers to atrophy….By this time she was using a walker for stability, her balance is poor and movement slow and deliberate."  *Id.*  Ms. Lambert stated that

Dr. Harpring "thought the surgery would stop the atrophy and she would regain her strength with rehabilitation." *Id.* at 2.

However, by the middle of June 2011, petitioner had become "extremely weak and neuropathic, the walker helped with balance and stability and was used full time. Her mobility was limited to the restroom and family room…Mom's decline was quick and still no diagnosis…Early July…mom is full time in a wheelchair…Dr. Harpring stated he was scheduling an appointment for my mom, Bobbie to immediately see Dr. Zakaria, a neurologist…July 2011…Mom was in a wheelchair full time. Dr. Zakaria listened to mom's journey to date about the neuropathy in her feet, legs, hands & arms. Her extreme weakness, dizziness, fatigue, tingling, neuropathy, off balance and the fact she was unable to take care of herself. Dr. Zakaria scheduled many invasive tests… By morning we were headed to the emergency room…Dr. Zakaria entered the room…under his breath he said CIDP…I remember writing this down in my journal…I began studying all the available information, few clinical trials of using IVIG treatment were available, Plasmapheresis and high dosage of prednisone were used for patients with CIDP. I spent hours listening to Neurological webinars, learning everything I could about Chronic Inflammatory Demyelinating Polyneuropathy…the horribly fast pace of this disease is very hard…we are all exhausted but thankful for the answer Dr. Zakaria gave us." *Id.* at 3-4.

### vi. Janet Lambert's Second Affidavit

In anticipation of the hearing, Ms. Lambert submitted another affidavit dated February 12, 2016. In this affidavit, Ms. Lambert stated that when she went to visit her mother a few days after her return from Turkey on October 6, 2010, she "immediately noticed Bobbie's left leg dragging like a drop foot...As the following three or four weeks passed, Bobbie's decline became very pronounced…By 2 pm each day, Bobbie's eyes would glaze over and it was difficult for her to communicate because she was so exhausted. Bobbie's normal daily activity ceased to exist and it now included 2-3 hours of deep sleep starting almost exactly at 2:00 pm." Pet. Ex. 52 at 2.

Ms. Lambert affirmed that for Thanksgiving 2010, her mother was unable to celebrate in her usual fashion "due to her lack of balance, her legs not working, the numbness in her feet and hands, her foggy memory and body demanding 2-3 hour midday sleeps." *Id.* at 3. She stated "[w]hen I think of my mother prior to the flu vaccine she receive on September 8, 2010, I think of a very energetic person constantly on the go. She was very involved and active with all her family. From February 8, 2011 forward, I never saw that same energetic person again." *Id.*

### vii. Carol Frazier's Affidavit

Carol Frazier, petitioner's sister, accompanied her on the trip to Turkey and submitted an affidavit in anticipation of the hearing. Ms. Frazier stated that during the trip to Turkey, she noticed that petitioner would elevate her legs. She remembered a hot air balloon ride after which her sister had to be assisted out of the balloon basket by the attendant. Ms. Frazier stated that petitioner had mentioned she was having difficulty with her legs and would seek medical care when she got home. Pet. Ex. 49, p. 1-2. Ms. Frazier did not testify at the hearing.

### viii. Don Windhorst, Sr.'s Affidavit

Don E. Windhorst, Sr., petitioner's husband, submitted an affidavit on February 12, 2016 in anticipation of the hearing. According to Mr. Windhorst, he and his wife led a very active life until her flu vaccine in September of 2010. Mr. Windhorst reported that when his wife returned from Turkey on October 6, 2010, she immediately expressed concerns about her legs bothering her the entire time. In mid-October he noted she was dragging both of her legs. By mid-October she was taking 2-3 hour naps. One day in mid-October, she came home from a walk and said she had fallen because her legs were not working properly. On October 23, 2010, they attended a University of Louisville basketball game at the YUM Center and Ms. Windhorst could not climb the stairs to exit the facility. Mr. Windhorst reported that she had good days and bad days, and with every good day thought she would be better. Pet. Ex. 51 at 2-3.

Mr. Windhorst stated that his wife saw Dr. Villaroman on November 8, 2010, and that Dr. Villaroman confirmed that the Premarin cream was most likely the cause of her leg pain. However, petitioner declined rapidly after that November 8, 2010 doctor visit. Mr. Windhorst stated that "Thanksgiving and Christmas 2010 were very difficult, and certainly different because Bobbie couldn't share in cooking with me…early January 2011, Bobbie's health was worse, not better. We began to get busy making some major life decisions because of Bobbie's declining health…we decided we needed to move to a one floor ranch style home because she could not manage the steps. We spent thousands of dollars to renovate and prepare the house for Bobbie, and moved in February of 2011. We had to install handicap bathrooms and showers because Bobbie could not lift her legs. We installed special handles that Bobbie could use for stability. We installed high toilets with handicap handles so Bobbie wouldn't fall. Every door knob and faucet had to be replaced with handle type levers and every cabinet/drawer in the house had to have elongated handles so Bobbie could fit her entire hand through to tug them open. We just thought this was our new life." *Id.* at 3-5. By February of 2011, petitioner "was needing full time physical care, which I and my children were doing." *Id.* at 5.

### ix. Don E. Windhorst, Jr.'s Affidavit

Don E. Windhorst, Jr., the petitioner's son, submitted an affidavit on February 12, 2016. Mr. Windhorst has a wholesale business where his mother sometimes helped to fill mason jars with chocolate nut pie ingredients. This task required her to carry bags of ingredients weighing up to 25 pounds. After her return from Turkey in October of 2010, Mr. Windhorst affirmed that petitioner could no longer carry the bags, pour the sugar, or stand for 2 to 3 hours. She worked more slowly and her hands and legs did not have the strength they previously had. She could not properly grasp the jars. She stopped working the second week of November 2010. Pet. Ex. 53, p. 1-2.

### x. Sandy Carroll's Affidavit

Sandy Windhorst Carroll, petitioner's other daughter, submitted an affidavit on February 12, 2016 in anticipation of the hearing. In her affidavit, Ms. Carroll affirmed that her mother complained of leg pain in the beginning of October 2010 and that she noticed she was not going out as much. Petitioner told her that she was very tired. Ms. Carroll also noted that through the

16

holidays, her mother "contracted Shingles and seemed to be really sick.  I assumed her continued weakness was associated with the Shingles and she would start feeling better when that resolved…I specifically recall my parents came to my house to visit me for my birthday, (January 15, 2012), they entered the house through my garage, and I remember Bobbie holding on to my father's arm tightly, totally dependent on him to walk.  She had no balance and she could barely make her legs move."  Pet. Ex. 54, p. 1-2.  Unfortunately, Ms. Carroll was unexpectedly called away just prior to being called to testify at the hearing and therefore did not testify.

### xi. Betsy Powell's Affidavit

Betsy S. Powell, Ms. Windhorst's sister, submitted an affidavit dated February 12, 2016.  Ms. Powell did not testify at the hearing.  Ms. Powell had accompanied petitioner on her trip to Turkey.  Ms. Powell simply stated that she remembered her sister sitting by herself on the bus rides in order to have more room to stretch her legs due to leg pain.  She said that "[t]his was a surprise, since Bobbie is not a complainer."  Pet. Ex. 55, p. 1.

### xii. Shirley Whittaker-Burba's Affidavit

Shirley Whittaker-Burba submitted an affidavit on February 12, 2016.  Ms. Whittaker-Burba did not testify at the hearing.  Ms. Whittaker-Burba and petitioner volunteered at Dare to Care, an organization that brings food to children who do not have food for the summer or weekends during the school year.  Their Sunday school class packs bags for these children one day each month.  According to Ms. Whittaker-Burba, after petitioner's flu shot in September of 2010 and by late 2010 or early 2011, petitioner could no longer help with the packing the bags for the children.  Pet. Ex. 57, p. 1-2.

### xiii. Jean Hoskins's Affidavit

Jean Hoskins, one of petitioner's friends, submitted an affidavit on February 12, 2016, in anticipation of the hearing but did not testify.  According to Ms. Hoskins, the petitioner was very active prior to September of 2010 and travelled with her family a lot.  In late October early November of 2010, Ms. Windhorst told Ms. Hoskins about "unusual symptoms including lack of muscle control, severe aches and lack of energy."  Pet. Ex. 58, p. 1-2.  Ms. Hoskins did not explain why she was able to recall when Ms. Windhorst made those comments.

## E. Testimony at Hearing

The hearing testimony was unpersuasive in providing any credible support to the petitioner's account of leg symptoms associated to the flu vaccine, and further contradicted the affidavits submitted herein.  I will summarize the various witnesses' testimony.

### i. **Petitioner's Testimony**

Ms. Windhorst [5] initially stated that she wrote her affidavits, but that she believed her daughter typed them and sent them to the lawyer.  Transcript ("Tr.") 86.14 to 87.6.  She then admitted that her daughter Janet helped her.  "I tried to prepare them myself. Most – most of it is –no, I—I did—I did most of it…we would – I – I couldn't remember certain things.  And sometimes she – some good information she had on – she—she kept good record…she could remember better than I, because a lot – it's hard to recall things, or it was for me."  Tr. 112.18 to 113.15.

Petitioner described herself as an active person who routinely walked three to five miles every day.  Tr. 21.9 to 22.18.  She was an avid gardener and took exercise classes at her church.  Carpal tunnel syndrome had forced her to give up tennis.  She also watched her grandchildren, read, and helped her son with his business.  Tr. 24.15 to 26.19.

Petitioner testified that on September 22, 2010, she drove from Louisville to Cincinnati to catch her flight to Turkey.  After a couple of hours on the plane, her legs, especially the left one, started to bother her; they ached and tingled.  A fellow passenger told her to get up and walk around.  Tr. 14.10 to Tr. 14.23; 15.1 to 15.14.  Her legs continued to get worse, so she took Tylenol.  Tr. 16.5 to 16.13.  Her feet were swollen, but everyone said that it was common on a long flight.  Petitioner testified that Carol Frazier and Betsy Powell knew that she was having difficulties with her legs.  Tr. 17.5 to 17.24.  The swelling was gone by the next day, but the tingling continued.  Tr. 18.4 to 18.12.  They travelled to a different location every day, but she knew she could not manage changes in elevation and had to stick to flat areas—no hills, climbing, or steps.  Tr. 20.9 to 22.18.  Petitioner stated that during the trip, she thought the pain would go away.  Tr. 23.3 to 23.23.

Ms. Windhorst stated that she returned from Turkey on October 6, 2010.  Her legs still bothered her, and she still had pain and numbness and tingling. The pain never went away.  She tried to go back to walking but could only go about a half mile before having to turn back.  Shortly thereafter, around the middle of October, her left leg started dragging.  Tr. 26.20 to 28.24.  Around this time, her arms and hands also began to tingle.  She stated that she started losing strength in her hands and lifting her arms to shampoo her hair got very difficult.  She could no longer operate a hair spray bottle, she didn't have the strength in her little finger to do that.  She confirmed that this was all in October of 2010.  Tr. 31.22 to 32.30.

She further testified that she stopped picking up her grandchildren from school in October because "I didn't trust myself to drive…I didn't trust myself to drive for that distance to pick them up."  Tr. 59.20 to 61.4.  She stated that her daughters were aware of what was going on since they would speak often and "we would go over what was going on."  This was the middle of October.  Tr. 60.12 to 60.23.  She also stopped going to her son's business in November.  Tr. 61.5 to 61.18.

---

[5] I note that the transcript incorrectly identifies petitioner as "Bobby Windhorst."  Her name is spelled "Bobbie."

Ms. Windhorst recounted a fall she took in late October or early November, and stated that she never walked alone again. Tr. 29. 19 to 31.6. She stated that Janet would come over occasionally and take her for a walk down the street to the park and they would sit while Janet's son would play. Tr. 30.16 to 31.3. She further testified that in this same time frame, late October/early November, she had started sleeping for a few hours during the day. She had also started going to bed at 7 or 8 pm. Tr. 32.22 to 33.25.

Ms. Windhorst recounted her visit to Dr. Villaroman on November 8, 2010. She testified that she told Dr. Villaroman about her trip to Turkey, that she had a difficult time with her legs, the flight was long and that her legs swelled. She stated that she told Dr. Villaroman that her arms were weaker, that shampooing her hair bothered her. She stated that Dr. Villaroman "…checked – and, you know, she looked at me, and she—you know, she checked. And she says, 'well, that'- - she said, 'well, that –those long trips can do that, you know. The long flights at your age.' She said, 'you're 72 years'… 'It's would be - - it would be tiring on the body.'" Ms. Windhorst continued, "…she took a lot of blood work to check me out. And I had told her that I had –I had been taking Premarin[6] prior to that time, and I told her that I had quit taking the Premarin cream. And – and – and that was about – I think that's – that's about what I told her." Tr. 40.3 to 41.6. Ms. Windhorst then stated that Dr. Villaroman spent five to seven minutes with her and that no one took a medical history. Tr. 41.7 to 41.18. Ms. Windhorst later admitted that the blood tests run that on that date were the usual routine blood work taken at every visit and that the primary reason for the November 8, 2010, visit was to follow up on her hypothyroidism. Tr. 99.20 to 100.6. During that visit with Dr. Villaroman, petitioner received a pneumonia vaccine. Tr. 47.7 to 47.22. Later, petitioner stated that she never mentioned to Dr. Villaroman that she had fallen and admitted that she didn't tell Dr. Villaroman that she was having trouble with daily activities like washing her hair and brushing her teeth. Tr. 113.16 to 114.9.

Ms. Windhorst continued testifying that after her visit with Dr. Villaroman, her legs got weaker and that she experienced hot, prickly, and tingly sensations. Everything was getting weaker—she couldn't cook, cut her food, bake, or button her clothing. Tr. 48.15 to 50.8; Tr. 70.22 to 71.9. She testified that there were good days and bad days, and when she had the dizzy spells, those were more tiresome days. She never thought to call Dr. Villaroman; she just thought she would get better. Petitioner said that she was "just not used to calling doctors for

---

[6] Ms. Windhorst testified that she was prescribed Premarin after undergoing bladder surgery, and took it for a year with no problems. Tr. 89.1 to 93.21. She discontinued the Premarin because she was having memory problems. The first year she took Premarin, she did not recall having any problems. Eventually, however, she noticed mental decline. Ms. Windhorst said that she did not know why Dr. Villaroman mentioned that petitioner had connected Premarin with leg pain (as noted in the record). Petitioner suggested that because English is not Dr. Villaroman's native language, something may have gotten lost in the communication. During the hearing, petitioner testified that she had stopped taking the Premarin in about June of 2010 and that she never connected the Premarin with her leg pain. Tr. 41.19 to 45.6. When questioned about a reference to having stopped Premarin in March of 2010, petitioner said that she had probably given that date to Dr. Villaroman, but seemed sure that June was correct because she kept track of the date in a notebook. Tr. 89.1 to 93.21.

every little thing.  I'm just not a complainer…I was not used to seeing a doctor, never… I'm so healthy, I—never had a doubt in my mind that this wouldn't go away."  Tr. 54.19 to 57.22.

Petitioner stated that she became dizzy in November of 2010.  She recounted an instance when she went to a fabric store and became dizzy, "so I walked over to that – I walked over to the flat – to the flat platform and I sat down.  And I ended up literally lying down on the platform for a few minutes to where I felt like I can get up.  And then I got up and drove home."  Tr. 50.6 to 54.1.  She also stated that she fell while putting on a pair of pants (Tr. 71.10 to 71.23) and while trying to pick something up off of the floor (Tr. 72.7 to 72.24).

Ms. Windhorst testified that she usually cooked for major holiday meals.  But during the holiday season of 2010, her declining health required her husband to do the cooking.  Everyone brought dishes, but it was a different holiday season than the family was accustomed to.  Tr. 57.23 to 59.19.  Just after Thanksgiving, Ms. Windhorst was diagnosed with shingles.  The doctor told her "shingles was an auto—you know, that my immune system was out of whack, you know.  If I was under a lot of stress, I would try to get it under control."  Tr. 63.20 to 66.3.

Ms. Windhorst testified that around this time, her husband suggested that they move to a ranch style home so it would be easier for her to get around.  He also believed that she had picked up an illness in Turkey.  Tr. 54.2 to 54.18.  She said that she believed her daughter Sandy had previously looked into assisted living communities for them, but that she and her husband were not ready for that.  Mr. and Ms. Windhorst ultimately moved into a ranch home in February of 2011.  Tr. 63.3 to 63.19.

Petitioner stated that in late 2010, she was in almost daily contact with her daughter, Ms. Lambert.  In the New Year, however, they spoke less frequently because Ms. Lambert was busy and the cold prevented Ms. Windhorst from wanting to do much.  Ms. Windhorst said that it was not her pattern to speak with her daughter Sandy Carroll as frequently.  Tr. 67.1 to 67.25.

Ms. Windhorst testified to going to her daughter Sandy's house for her birthday in January of 2011.  According to Ms. Windhorst she had to use the garage to get into the house because she could not manage the steps in the front of the house.  She stated that her husband "was literally pushing and pulling me up the – up the stairs."  Tr. 69.3 to 4.  Ms. Windhorst said that she had not seen Ms. Carroll in a while and that Ms. Carroll was distressed by Ms. Windhorst's appearance.  Petitioner said that her daughter did not say anything, but that she could read her expression.  Tr. 69.6 to 69.25.

Ms. Windhorst's other daughter, Ms. Janet Lambert, celebrated her birthday on February 25, 2011.  Ms. Windhorst met her daughter at a restaurant.  She stated that Ms. Lambert had to cut her food for her because she could not.  Tr. 70.1 to 70.18.

Ms. Windhorst described doing her daily exercises with two pound weights in February of 2011.  She stated that she lifted the weights over her head and felt a hot sensation from her thoracic spine into her brain.  She was numb all over.  She then called Dr. Villaroman's office and drove herself there.  Dr. Villaroman examined her and ordered an MRI.  Ms. Windhorst testified that during the visit, she told Dr. Villaroman that she had been having problems with her

arms and hands for several months.  She said that she did not know why Dr. Villaroman wrote "two months," but suggested that English is not her first language.  Petitioner testified that she did not recall telling Dr. Villaroman about having problems with her legs, but said that she assumed that Dr. Villaroman knew from her previous visit.  She said that Dr. Villaroman spent approximately five to seven minutes with her during this visit, and that no one took a medical history.  Tr. 75.12 to 78.3.  After the visit, Dr. Villaroman informed her that she had a bulging disc in her neck and referred her to a neurosurgeon.  Petitioner said that she thought that was the reason for all of her problems.  Tr. 73.6 to 75.11.

Ms. Windhorst's testified that her first visit with Dr. Harpring was a consultation.  Tr. 78.4 to 78.14.   Dr. Harpring showed her the MRI and said surgery would help her arms and hands, but not her legs.  Petitioner testified that at this point in time she had to balance herself on the wall to walk, though she did not rely on a wheelchair or any other device. Tr. 83.1 to 83.8.

Ms. Windhorst was questioned about a reference in her affidavit to using a wheelchair in the fall of 2010, to which she replied that it was just "to the car, into the doctor's office, or wherever I was going – because sometimes it would be a long walk, and there's no way I could walk down all – even – like even down to this hall at that time…I used the walker…I used the walker sometimes out, but you—I—a walker will help support you, but if your legs – if you're really tired, you have to sit down."  Tr. 130.5 to 130.22.  She then admitted that she never had a wheelchair but stated she had a walker in her home.  Tr. 87.7 to 88.25.  Ms. Windhorst then stated that she was in really bad shape in the fall of 2010 and believed that she went to her visit with Dr. Villaroman on November 8, 2010 with a walker, though she admitted that she drove herself to that appointment.  However, when reminded that she did not see Dr. Zakaria until July of 2011, she amended her statement and testified that she did not have a walker at all until her second visit with Dr. Zakaria in July of 2011.  Tr. 132.22 to 134.18.

When petitioner returned to Dr. Harpring's office for a follow-up six weeks after the surgery, petitioner said that "he was literally shocked…he was concerned about my legs."  Tr. 80.8 to 80.12.  Dr. Harpring ordered an MRI, but told Ms. Windhorst that he saw no reason for what was happening with her legs.  He referred her to a neurologist, Dr. Zakaria.  Tr. 80.8 to 81.15.

Ms. Windhorst testified that when she saw Dr. Villaroman again in July of 2011, Dr. Villaroman "was blown away", she had "never heard of CIDP and had to look it up."  Tr. 83.9 to 84.19.

During cross-examination, petitioner became considerably more confused about what had happened between the fall of 2010 and her diagnosis with CIDP in the summer of 2011.

According to Ms. Windhorst, she kept notes but was "just not one to write everything down," but her daughter encouraged her to keep a journal.  I requested that Ms. Windhorst provide the notes that she had relied upon for the timeframes contained in her affidavits, particularly the writings she consulted when drafting the affidavit dated February 2016, which contained the most specific dates and details of any of the affidavits petitioner submitted in this matter.  In response to my request, she stated: "I don't know that I can do that, because I—I—

I—I just – I – I'm—I'm sorry.  I just don't know that I can do that, because I don't know that I could find them.  I don't even know where I came up – I – it just—I don't know.  I—I—I'm sorry.  I can't remem—I can't—it's just one of those things I can't remember…I don't know – I didn't think that would be such a discres – I mean, I don't – I don't know…Well, I can go…I'll try to come up with those dates.  I – I—I—I—right now I can't tell you exactly where I saw it."  Tr. 95.17 to 96.22.

Petitioner was presented with the contents of Dr. Villaroman's office notes[7] detailing the November 8, 2010 visit (noting that petitioner had been on Premarin cream for HRT for a year, but that it caused leg pain and memory issues and that petitioner had discontinued it and felt much better).  Pet. Ex. 5 at 116.  Ms. Windhorst stated, "I do not recall that.  I remember talking about – I –re—I re—I know I told her that I'd taken myself off the Premarin cream and I had told her I had leg pains.  I even told her I had arm pains, but I don't remember say—telling her I was doing better."  Tr. 97.2 to 98.10.

Ms. Windhorst was asked if she drove herself to the appointment with Dr. Villaroman in February of 2011 and if she felt that her legs functioned well enough to safely control a vehicle.  Ms. Windhorst responded, "Oh yeah.  Absolutely – well, as long as I stayed where I knew where I was and where I was going, but – I didn't drive—I didn't drive that often, but I but I felt like if I had to, I could…I wasn't told not to drive."  Tr. 98.11 to 99.19.

In her affidavit submitted two weeks before the hearing, Ms. Windhorst stated that "[b]y February of 2011, I was exhausted every afternoon requiring lengthy naps."  Pet. Ex. 50.  When asked about her napping habits, Ms. Windhorst responded "Well, I was –I—I was—well, I probably did.  I was, but I was also – in October and November, I would take short naps.  Those became very lengthy."  Tr. 100.12 to 101.7.

Ms. Windhorst was asked if she had mentioned her leg problems to the doctor at the Urgent Care who diagnosed her with shingles in November of 2010.  She responded, "No, I never mentioned it…I didn't think he would have any idea.  I—it just never entered my mind to have asked him."  Nevertheless, she maintained that at that time, she was experiencing pain, numbness, and weakness in her legs.  Tr. 101.8 to 102.4.

Ms. Windhorst was asked about the examination conducted by Dr. Harpring on April 7, 2011, in particular his notation that her chief complaint was neck and intrascapular pain for the past few months and that he documented "[n]o lower extremity problems with walking...negative straight leg raising test to 90 degrees bilaterally.  No pain with internal or external rotation of the right or left legs at the hip joint.  Negative FABER sign bilaterally…station and gait normal."  In response, Ms. Windhorst stated that she did not recall him examining her legs, though he may have.  She said that if he had determined her gait was normal, "that was his opinion."  Tr. 102.18 to 105.1.

---

[7] Because the original handwritten notes were difficult to read, a transcribed copy was filed as Pet. Ex. 48.

According to Ms. Windhorst, at her first visit with Dr. Zakaria he asked a lot of questions. When confronted with the notes written by Dr. Zakaria (stating that her leg weakness started in January and that she was still able to walk on her own without any help), Ms. Windhorst responded that she didn't recall that at all because she was having a lot of problems. Tr. 105.2 to 106.6.

Another issue with conflicting recollections related to petitioner's move to a new home in February 2011. When asked about it, she stated "I think it was January or February of elev – of 12 maybe. I—I can't – don't..." When it was noted that her affidavits said it was in 2011, she responded that she could not give a definitive date. Tr. 106.7 to 106.10. (This move pre-dated petitioner's diagnosis with CIDP by over 6 months, was prior to her visits with Dr. Harpring and/or Dr. Zakaria, and prior to the February incident with her weights and visit to Dr. Villaroman on February 28, 2011.)

When questioned about modifications to the home, Ms. Windhorst testified that modifications were done to the ranch-style house to make things easier for her. She said that she and her husband now live in a "patio house" (also a one-story structure) because the ranch-style house was too big and she could not take care of it. Tr. 106.7 to 108.18. Respondent's counsel requested that petitioner provide all of the documentation to support the purchase of the ranch home along with all the bills/documents associated with the modifications to the house. Petitioner stated that she had the documents and would do so. Tr. 107.1 to 107.18.

Ms. Windhorst was asked if she had seen any other doctors between her diagnosis with Shingles at Urgent Care in November of 2010 and her next visit with Dr. Villaroman on February 28, 2011. Ms. Windhorst said that she had not. "I don't think I saw a doctor—in my mind, I always thought this was going to go away…I just thought this was going to get better…I saw no other doctors other than the ones that I mentioned. And why I never brought up other things? I don't know. I—I—I have no idea. I'm a very proud person. I guess I just didn't want to talk about all – everything that was going on. I don't know. I'm sorry that I didn't." Tr. 114.10 to 115.13.

When asked about her medical history prior to September of 2010, specifically the reference in her records to the use of Actonel in the early 2000s and the fact that she discontinued it due to complaints of leg discomfort, dizzy spells, and pain in her legs when walking, she responded that Actonel was the only thing she was taking, so she went off of it. Tr. 111.23 to 112.8. She likewise admitted that the leg pain and myalgia/arthralgias she complained of since 2001 were very similar to the pain she allegedly experienced in the fall of 2010 through the summer of 2011. She elaborated that in 2004 when she was taking Actonel, her leg pain lasted for three months or more and when she stopped it, the pain went away. Tr. 123.9 to 125.12. Ms. Windhorst recalled seeing a neurosurgeon in or around 2004 for her neck pain and numbness and tingling in her arms and hand. She likewise admitted that she had dizziness and tingling in her fingers from that time onward, though she stated that the dizziness went away. Tr. 121.13 to 123.8.

On redirect, Ms. Windhorst was pressed about the confusion surrounding her discontinuation of Premarin. Although petitioner originally said she went off of the medication

in March of 2010, she later said that she thought it was June, "because I think I saw Dr. Villaroman in June…and I didn't tell her that I was off of the Premarin.  And I would – and had I been off of it, I would have mentioned it to her…because you always tell your doctors when you're taking medication off.  And that's probably how I figured – thought of that.  It – it had to have been after June or the end of June."  She stated that she stopped using the Premarin cream because she had "light dementia."  She claims to still have problems "keeping up."  Tr. 127.24 to 130.4.

### ii. Testimony of Don Windhorst, Sr.

When petitioner's husband, Don Windhorst, Sr., began his testimony, he repeatedly referred to his affidavit,[8] which he brought with him to the stand.  I stopped counsel's examination and asked Mr. Windhorst to put the affidavit away and respond to the attorney's questions without referring to it.  Mr. Windhorst responded, "let me say this about dates, you know, you're going to ask me a date or – a date and – and I'm not going to know – I'm not going to swear to that…but everything I tell you will be exactly the truth of what I said…and I don't expect it to be questioned."  Tr. 138.20 to 140.11.

It was pointed out that the affidavit, which contains specific dates, was submitted just two weeks prior to the hearing.  Mr. Windhorst was asked what he relied upon to provide those specific dates.  He replied "We – we estimated it at certain times, you know, that we were there.  We know that it was in the time frame; but maybe it might have been a date off or something like that…"  Tr. 140.16 to 141.11.

According to Mr. Windhorst, he and his wife led a very active lifestyle, full of family gatherings, nights at the theater, dinners with friends, walks, dinners out three times a week, University of Louisville games, short trips day trips several days a week, and overnight trips every other month.  Tr. 142.14 to 145.9.

Mr. Windhorst stated that before she left for the Turkey trip, his wife was in excellent health.  He said that he could not remember her ever having a cold.  He insisted that she had never experienced leg problems before the fall of 2010.  She walked every day, worked outside in the garden, and ran the household without any assistance.  Tr. 145.10 to 147.15.

Mr. Windhorst testified that he noticed a change in his wife "immediately on her return from Turkey."  She said her legs were bothering her.  She said that she had to sit out on some group activities during the trip.  "I had pictures.  And I said, 'Did you go' – and all her sisters and them were up in this – like this – well, it was a thing you go up in.  And I said, 'Why aren't you – got your head sticking out?' She said, 'I couldn't get up the steps.'"  Tr. 147.22 to 149.27.

According to Mr. Windhorst, his wife tried to start walking again after she returned from Turkey, but she "got fatigued."  Mr. Windhorst estimated that a few weeks after her return, petitioner said the ends of her arms and her feet were stinging.  He thought she picked up an illness in Turkey.  Tr. 149.18 to 152.4.

---

[8] Mr. Windhorst's affidavit was filed two weeks before the hearing.  It is Pet. Ex. 51.

Mr. Windhorst stated that a few weeks after petitioner returned from Turkey, she started taking naps.  He noticed that if they spent too long in the car, she would get "fatigued."  She was not working in the garden or making plans with friends.  Tr. 152.13 to 155.6.  He said that right after she returned from Turkey, his wife started going to bed at 6 or 6:30 even after napping for two or three hours during the day.  Tr. 163.1 to 163.24.

Mr. Windhorst recounted his wife's difficulties with the stairs at the University of Louisville basketball game.  He said that although she walked down the stairs to their seats, she was unable to walk back up.  According to Mr. Windhorst, he had to seek out a security guard to let them out of the stadium on the level they sat in, where the players are.  Tr. 155.10-158.22.

According to Mr. Windhorst, Ms. Windhorst had good days and bad days.  She would always tell him how she felt and they would plan the day around that.  "We didn't hang around the house.  We wanted to go, you know.  We – we were active."  Tr. 158.23 to 160.14.

According to Mr. Windhorst, petitioner fell several times.  The first time was in the middle of the autumn.  Ms. Windhorst fell while walking through their neighborhood.  Thereafter, she fell several times while using the bathroom.  Once she fell while getting dressed.  Several times he found her in tears.  He said that all of this transpired before petitioner's visit to Dr. Villaroman in November of 2010.  Tr. 160.15 to 162.19.  Mr. Windhorst stated that he asked her to go to the doctor but she said she had an appointment and she would wait.  Tr. 162.20 to 162.25.

At Thanksgiving and Christmas that year, Mr. Windhorst did all the cooking.  Ms. Windhorst could not pick things up and was unable to participate as she had in the past.  Mr. Windhorst said that he prepared both family meals, and still does to this day.  Tr. 163.15 to 164.22.

In response to questions suggesting that the Windhorsts moved as a result of Ms. Windhorst's declining health after the flu vaccine, Mr. Windhorst stated that he had already started talking to his wife about moving to another house in October of 2010.  At that time he already had something in mind and had thought about the ideal neighborhood.  He further testified that modifications were made to the house because "she was telling him that she was having trouble turning knob and things like that, you know , so – so you know, we changed all the doors to the levers, you know…to the new house."  The bath was modified and a shower chair added so that she could get in and out.  They also installed taller toilets.  Tr. 164.23 to 167.9.  When asked about assisted living, Mr. Windhorst stated "…my daughter, Sandy, was – she'd even looked into stuff like that, you know, without us knowing it…we're just – just not ready for that."  Tr. 167.10 to 168.4.  According to Mr. Windhorst, their daughter Sandy Carroll handled all of the modifications to their new home.  Tr. 177.10 to 178.6.  All of the renovations were paid for in cash by himself and by Sandy.  Tr. 181.5 to 181.10.  Respondent's counsel requested that Mr. Windhorst provide all the documentation for the modifications to the home to which he advised Sandy "…is good at that stuff…She can handle them for me."  Tr. 177.10 to 178.6.

Notably, on cross examination, Mr. Windhorst stated that he and his wife had been discussing a single-story style ranch home even <u>before</u> Ms. Windhorst went to Turkey. They moved to their new home in early 2011. Tr. 174.7 to 175.6.

Mr. Windhorst could not remember when his wife went to see Dr. Villaroman in the fall of 2010, but believed it to be sometime in October. He said that his wife had told him that Dr. Villaroman said she was fine. She came home and said "all of the blood work was perfect." They thought everything would just go back to normal after that. But after that it "[g]ot worse…Nothing changed, you know. Nothing." Tr. 168.5 to 170.5.

With reference to the affidavit Mr. Windhorst submitted two weeks before the hearing, he stated that he prepared his affidavit using notes, but didn't know if he still had the notes. He admitted that the notes were not from 2010: "I don't keep anything that long; no, sorry. I got – no, I had trouble remembering a lot of the stuff, you know, that's back that long ago. It's hard to—." He insisted that his daughter, Janet Lambert, did not help him, and that in fact no one helped him. He said the facts in his affidavit were "just things I remembered." Tr. 175.7 to 177.2.

However, in response to my questions, Mr. Windhorst stated that Ms. Windhorst had a calendar, admitting that "I wouldn't have been able to pinpoint it unless somebody told me about it." Mr. Windhorst likewise admitted to using the medical records for dates and said that he would "look back on the medical records and you see what dates she had an appointment with certain doctors." Tr. 181.11 to 183.9.

### iii. <u>Testimony of Janet Windhorst Lambert</u>

Ms. Lambert noted initially that when her mother returned from Turkey, she and her family were in the process of moving to a new house and were packing the week between October 10th and 15th. Tr. 197.13 to 197.20. She and her family had taken a trip to Florida before preparing to move houses. Because of other commitments, she did not see her mother until about three or four days after Ms. Windhorst had returned from overseas. Tr. 195.13 to 195.25. Ms. Lambert was asked how she remembered the dates in this matter and she responded: "I had to go back to my agendas and journals" to "get all the dates and put the calendar together of what was going on." Tr. 197.18 to 199.9.

Ms. Lambert stated that when she saw her mother, she noticed that she was dragging her foot and asked if she had injured it. Petitioner told her that it had been a very uncomfortable trip and that her legs were in pain. They did not discuss the matter further. Tr. 196.1 to 197.12.

According to Ms. Lambert, she moved into her new house on October 15, 2010. In anticipation of the move, her mother came over to help pack. However, Ms. Lambert noticed that her mother became very tired and went home early. Tr. 197.18 to 199.9.

Ms. Lambert testified that sometime in November, she resigned from her position in real estate to take over the business her husband started 20 years ago. In real estate she had to work late evenings and weekends, and her new position required less demanding hours. Although it

was a good fit for her skill set, Ms. Lambert implied that her new position was partially related to her mother's inability to care for her son anymore. Tr. 199.19 to 201.23. She said that her mother could not do anything after 2 p.m. Tr. 207.2 to 207.8. She then admitted that Ms. Windhorst still took care of her son in November "…a little bit, but not – yeah, he would have been in school the week we moved, so I was probably taking care of him because she was – because around more. So yes – but she did take care of him." Tr. 199.10 to 199.18.

Ms. Lambert testified that Thanksgiving and Christmas that year were solemn holidays. "Mom's energy level was so low and her legs were so – I mean, she just was not functioning to her – by far, nowhere near her level, and her legs were always in pain, and she was just sitting. I mean, she did a lot of sitting." Mr. Windhorst did all the cooking. Tr. 201.24 to 203.12; *see also* Tr. 226.8 to 227.23. Ms. Lambert further stated that over the holidays, she and her sister Sandy Carroll spoke about moving their parents to a different environment. Ms. Carroll had looked into assisted living facilities because their mother's decline "was so shocking." Tr. 208.20 to 210.4.

I asked Ms. Lambert whether over Thanksgiving and Christmas she observed her mother having to hold onto walls to walk or using a walker. Her response was "I just remember—I just don't remember a lot of walking. I just remember her sitting a lot. Yeah." Tr. 226.14 to 227.23.

Ms. Lambert testified that she usually spoke to her mother every day and would ask how her mom was doing, but "[y]ou have to sit down with her, spend time with her, and then you know what's going on." She said that her mother was "not one to complain ever." Ms. Lambert said that although she suspected something was happening, she was in denial. Tr. 203.13 to 205.20.

However, Ms. Lambert then admitted that she had a lot going on between moving houses and changing jobs. She stated she spoke to her mother over the holidays, when she had a few days while business was closed down. But in January, business was "full speed ahead" and she could not speak to her mother as often. Tr. 207.12 to 208.19.

Ms. Lambert's birthday is February 25. She noticed when she met her mother for a birthday lunch that her gait was off. Having not seen her mother since the holidays, Ms. Lambert noted that she looked feeble and could not pick up a cup. Petitioner told Ms. Lambert that she could not spray her hairspray and that Mr. Windhorst had to help her get dressed. Ms. Windhorst said that her "fingers won't work." Janet stated, "I knew at that time that I'm just going to have to be an advocate and move this forward and see what in the fire is going on, because this is not going away. It's getting bad." Tr. 210.5 to 212.24.

After the birthday lunch in February of 2011, Ms. Lambert began actively monitoring her mother's care. "I just remember that day that I decided that was the day I was going to take over mom's healthcare." Tr. 213.5 to 213.16. Ms. Lambert stated that she went to each of her mother's medical appointments after that. According to Ms. Lambert, Dr. Villaroman referred her mother to Dr. Harpring, who told them that surgery on the c-spine would make the atrophy of petitioner's hands correct itself. Ms. Lambert thought that would fix her mother's legs, too, "but after reading the things, maybe not." Tr. 214.12 to 214.21. However, Dr. Harpring's focus was getting Ms. Windhorst's hands moving again. Following Ms. Windhorst's surgery, Dr. Harpring

thought she was doing very well.  Six weeks later, when they went back to Dr. Harpring, the atrophy in petitioner's hands had gotten better but the tingling and numbness were still present. Further, her legs had deteriorated.  Dr. Harpring ordered an MRI to see if anything could be done to help with her legs.  After the MRI, he said there was nothing he could do and referred petitioner to Dr. Zakaria, a neurologist.  Tr. 213.19 to 216.20.

I asked Ms. Lambert if she accompanied her mother to the July 2011 visit with Dr. Zakaria and if she recalled her mother stating that her leg problem started in January of 2011. Pet. Ex. 6 at 330.  Ms. Lambert responded: "Well, we told him – told him that it was going on since October, that she was losing her – because we saw him for the first time, and I remember being there and just telling him the whole story.  She and I – and I spoke for her back then."  Tr. 227.24 to 228.22.   When asked if Dr. Zakaria's notes were wrong, Ms. Lambert responded "No…If that's what he heard.  I – I mean, I don't –I –I would—I do not remember telling him January."  Tr. 228.24 to 229.5

I also asked Ms. Lambert if she was present at the initial consultation with Dr. Harpring in April of 2011when her mother gave a history of neck and arm problems for "the past few months."  Ms. Lambert confirmed that she was present but stated, "I don't.  I just remember talking to him and just more descriptive stuff."  Tr. 229.8 to 230.5.

When asked if any doctor was ever told that petitioner's symptoms started after her return from Turkey, Ms. Lambert stated, "With Zakaria, for sure.  With Harpring, I mean, he took the you know, we've been saying it's been going on for months.  So I do not remember specifics like that; no."  Tr. 230.6 – 231.18.

Ms. Lambert testified that none of Ms. Windhorst's physicians were familiar with CIDP. She stated that when Dr. Villaroman was advised that her mother had CIDP at the visit in July of 2011, Dr. Villaroman said that she had never heard of the disease, and had to go look it up. According to Ms. Lambert, "Dr. Harpring took a class on CIDP, because he gig—you know, we—we told him what it was.  So he had a lot of the surgeons go in and learn about it."  "And at the time, when I was doing all the – so we're—we've already met Dr. Zakaria, so mom's already been told what she has.  So now we're going back and telling other docs…and, you know, just trying to educate people."  Tr. 218.10 to 220.50.

During cross examination, Ms. Lambert was asked again how she kept track of key dates in her mother's medical treatment.  She replied that she has journals, but they contain personal materials.  She said that she referred to those journals when drafting her affidavits.  She stated that although she read her mother and father's affidavits, she did not help in their preparation. Tr. 221.3 to 222.19.

I asked Ms. Lambert when she first learned that CIDP may be related to a flu vaccine. Ms. Lambert said that it happened when her mother was in the emergency room.  She stated that she observed Dr. Zakaria in the emergency room: "I'm watching every move the guy is making, and he's evaluating her.  And I heard him in his language go, 'CIDP' – or he said 'CIDP'.  If you saw him, he's just really meticulous, and he went 'CIDP'.  I wrote those down and started Googling, so at that time I knew that was probably what it was.  And then we did two – two

weeks of battery of tests, and then he said that's what it was.  And he said – he said 'It was an acquired – CIDP from an injection.'…"  When asked why that is not contained in Dr. Zakaria's records, Ms. Lambert described him as "meticulous with his patients.  He hated the computer.  He hated writing.  He hated all that stuff…that is what he told me, and that's how I started my journey with CIDP."  When it was pointed out that Ms. Windhorst had also had a pneumonia vaccine in November of 2010, two months after the allegedly causal flu vaccine, Ms. Lambert replied, "You know, CIDP, though, for him was the flu vaccine."  Tr. 231.19 to 235.2.

### iii. **Testimony of Donald Windhorst, Jr.**

Petitioner's son, Mr. Don Windhorst, Jr., testified that owns a business called the Old Honey Barn, where he bottles his own sauces, seasoning mixes, jellies, jams, and pie mixes.  His mother used to come to help him assemble the ingredients for chocolate nut pies.  During the holiday season, she usually came more often.  Before she left for Turkey, she was able to carry around heavy bags of ingredients and combine them in mason jars without any assistance.  Tr. 237.3 to 239.4.

Mr. Windhorst recalls calling his mother sometime after her return from Turkey to see how her trip was.  He remembered that she said it was great but that her legs hurt the entire time.  Tr. 239.18 to 242.4.

According to Mr. Windhorst, ordinarily petitioner would have come to help him in the two or three weeks before Thanksgiving, which is his busy season.  When she came in the fall of 2010, however, she asked him to carry and pour the sugar into the bowl.  She also asked for a chair even though she had always stood in the past.  He also observed her having difficulty chopping the nuts.  "It seemed to be a problem, coordination with her – with her fingers.  Holding up a – a cup that – with sugar and – she would pour into a sandwich bag, that was a challenge…but I knew she was in – in good – good care, because dad was with her and my sisters were – had taken control of her – her—her care."  That was the last time she worked.  Tr. 242.19 to 246.24.

Mr. Windhorst initially said that he did not see his mother again until she was in the hospital, but later corrected himself and stated that he also saw her at Thanksgiving and Christmas.  When asked about petitioner's condition over the holidays, he stated that he could not recall his mother experiencing any health-related incidents between Thanksgiving of 2010 and February of 2011, though he stated that his sisters kept him "posted."  Tr. 246.25 to 248.20.

Mr. Windhorst stated that he knows of, but has not met, Dr. Zakaria.  His sisters told him that Dr. Zakaria diagnosed their mother with CIDP and saved her life or at least a life out of a wheelchair.  Tr. 248.21 to 249. 9.

On cross examination, Mr. Windhorst stated the Turkey trip is the key to his memories of his mother's illness.  He further stated however that when his mother came to his business in November, he would have observed her walking, though nothing in particular stood out in his mind.  "What stands out was the difficulty she was having—well, she couldn't stand at her station.  She had to have a stool to sit in.  and then the – I guess, the fumbling with her fingers,

but the walking—if she rested – if she would have rested, she was able to walk." Tr. 251.9 to 252.8.

According to Mr. Windhorst, his sister, Ms. Lambert, got involved in their mother's healthcare as soon as she returned from Turkey.  Usually Ms. Lambert kept him informed about their mother's health, though occasionally he spoke with Ms. Carroll and their father.  Mr. Windhorst was not involved in his parents' selling their house and moving.  He could not recall if the 2010 holiday celebrations were at his parents' house or at Ms. Lambert's.  He said that he was not involved with renovations to his parents' ranch-style home and that his sister, Ms. Carroll, took care of that.  He did know, however, that they were doing something to the bathrooms.  Mr. Windhorst remarked that his parents now live in a townhouse.  Tr. 253.17 to 258.16.

When asked if he reviewed anything in order to testify at the hearing, Mr. Windhorst initially stated, "Just my Turkey trip and overnight last night I had the idea of going to my computer and finding a couple – if I could find some invoices for early November to see if I actually had any orders for pies."  When asked what he meant by the "Turkey trip," he stated that is how he remembers everything, but he did not put it in a calendar.  When asked what he looked at "last night" to confirm when her Turkey trip was, he finally said "I didn't look at anything." Tr. 258.17 to 260.25.

On re-cross, Mr. Windhorst stated that Ms. Lambert took over their mother's care immediately upon petitioner's return from Turkey.  He said that Ms. Lambert took petitioner to doctors from the time she returned from Turkey until she was in the hospital.  He was not involved in his mother's medical care.  Tr. 261.1 to 262.12.

## F.  Documents Produced after the Hearing

Following the hearing, an order was issued on February 25, 2016 for the production of the following: (1) all of Ms. Windhorst's medical records from any and all Urgent Care facilities; (2) any materials (diary, calendar, agenda, notes, etc.) that Ms. Windhorst relied upon to prepare all of her affidavits;  (3) any materials (diary, calendar, agenda, notes, etc.) that Mr. Windhorst, Sr., relied upon to prepare his affidavit, including but not limited to the handwritten draft affidavit that he testified he had prepared; (4) any materials (diary, calendar, agenda, notes, etc.) that Ms. Lambert relied upon to prepare her affidavits and the timeline of her mother's illness, with irrelevant personal information redacted; (5) photographs from petitioner's visit to Turkey, and in particular those that support Mr. Windhorst's testimony that there were many group pictures that his wife was not in because she was physically unable to participate, including the names of the individuals who took the photos.

In response thereto, on March 25, 2016, petitioner filed the medical record from Urgent Care for her November 27, 2010 visit diagnosing her with shingles. Pet. Ex. 59.

Petitioner also filed her written notes documenting events starting with her flu shot.  The notes indicate that in mid-October she noticed her leg was dragging and she found it difficult to walk her regular two and a half to three miles.  By the end of October, she was walking less than

two miles.  At her November 8, 2010 visit with Dr. Villaroman, she mentioned her left leg dragging but that Dr. Villaroman told her that she had arthritis in her left hip which was probably the cause.  In November, she began to walk shorter distances and felt more fatigue.  She wrote that on December 1, she could no longer walk in the park, but that she continued to perform exercises.  She had occasional dizzy spells, felt weaker, and had poor balance.  By Christmas, she was exhausted all the time, dizzy, dropping objects, and needed help with household tasks.  She stopped volunteering.  Pet. Ex. 60.

Petitioner's notes indicate that her health continued to deteriorate in 2011.  She wrote that on February 28, 2011, while lifting weights, she had an extremely warm sensation from her mid back up to the stem of her brain, causing her to drop the weights.  Her hands and toes began to tingle, her fingertips became numb, and she experience vertigo.  Petitioner called Dr. Villaroman, who sent her for an MRI, which ultimately showed a herniated disc.  Dr. Villaroman told petitioner that she needed a neurosurgeon.  At that point, she could no longer exercise, hold a glass, brush her teeth, shower, navigate stairs, use a knife and fork, or write her name.

She wrote that on April 7, 2011, Dr. Harpring examined her and informed her that surgery would help her hands, but not her lower extremities.  On May 16, 2011, petitioner underwent cervical surgery.  Although it was successful, within a few days tingling and numbness were still present.  Petitioner wrote that at her June 1, 2011, check up with Dr. Villaroman, she told her that even after the surgery, her hands were about the same, but her legs were extremely weak.  Petitioner said that she had to walk around the house holding walls and furniture and take daily naps.  Petitioner underwent a CT scan and then another MRI.  In early July, Dr. Harpring said there was no reason for petitioner's weakness and referred her to Dr. Zakaria.  Pet. Ex. 60.

In July of 2011, petitioner met with Dr. Zakaria, who took a complete medical history.  She underwent a battery of tests.  By the end of the month, she was using a walker.  After an electromyogram, Dr. Zakaria informed petitioner that she had CIDP and explained her treatment.  They planned to start her treatment in one week, but when petitioner began experiencing hot sensations in her arm, petitioner presented to the emergency room.  Pet. Ex. 60.

There is no date on the notes submitted by the petitioner, but they appear to have been written *after* petitioner's diagnosis of CIDP.  The notes likewise appear to be more consistent with the medical records than any of the affidavits or testimony petitioner provided in this matter.

Petitioner also submitted a calendar dated October 2010.  The calendar seems to reflect Janet Lambert's work schedule.  Pet. Ex. 61.

Petitioner also filed notes written by her husband.  Don Windhorst, Sr.'s handwritten notes appear to have all been written after his wife's CIDP diagnosis.  They provide no dates and no time frames, but for a note, written in different ink, mentioning "November 2010" written into the margin on one page.  Mr. Windhorst's notes discuss how deserving petitioner is of compensation from the Program.  Pet. Ex. 62.

Petitioner filed notes that were handwritten by her daughter, Ms. Lambert, dated between October 2010 and November 2010.  In the notes, Ms. Lambert asked God to protect her mother and her family and provide guidance to her in taking over the family business.  Pet. Ex. 63.

Finally, petitioner submitted 17 photographs from her trip to Turkey.  The images show members of petitioner's travel group visiting various historical sites presumably taken by the petitioner.  No pictures taken by the others on the trip showing petitioner were submitted.  Pet. Ex. 64.

Petitioner filed Exhibits 65 through and including 76 confirming that Ms. Windhorst was not seen in any other urgent care facility for any reason other than her November 2010 visit for Shingles.

Notably, although respondent's counsel requested that both Mr. and Ms. Windhorst provide copies of documents for the purchase of the ranch house and any and all documents showing the renovations of the new property, no such documents were filed.

## G.  Specific Findings of Fact

In order to overcome the presumption that contemporaneous written records are accurate, testimony is required to be "consistent, clear, cogent, and compelling."  *Blutstein,* 1998 WL 408611, at *5.  Ms. Windhorst's four affidavits and hearing testimony are inconsistent with the contemporaneous medical records as well as profoundly inconsistent with one another.  Confounding the inconsistencies is the testimony of petitioner, petitioner's husband, and petitioner's two children, along with the affidavits of various friends and family members.  I have found it extremely difficult to winnow fact from fiction in this matter.  Usually, a lapse of time is associated with a decline in memory; however, for the various witnesses in this case, time seems to have improved their abilities to recall specific details.  The dramatic improvement in recalling events as the years passed, however, declined precipitously at the hearing, as none were able to tell me how they managed to suddenly remember the precise dates provided in their affidavits submitted two weeks before the hearing.  The witnesses were likewise unable to tell me how they remembered the events so well during their courtroom testimony.

Based on a careful review of the medical records, affidavits, and hearing testimony, I find the following facts to be supportable.

1.  Petitioner had a long history of leg pain, and had been experiencing an increase of leg pain as early as the winter/spring of 2010.  Because of the increase in her leg pain, she discontinued her use of Premarin in the spring of 2010 sometime between March and June of 2010, believing that it, like the Actonel years before, was the cause.  She was also experiencing some memory problems that she attributed to the Premarin.

2.  Petitioner received an influenza vaccine on September 8, 2010.  On September 22, 2010, while on a long flight to Turkey, Ms. Windhorst experienced swelling of her feet, causing discomfort.  The rigors of the trip, the rough terrain in Turkey, and the time change

proved a bit much for her. She came home exhausted and it took her some time to return to her normal activities.

3. Both Mr. Windhorst and petitioner's daughter, Sandy Carroll, had been investigating alternative living arrangements before Ms. Windhorst went to Turkey. Ms. Carroll looked into assisted living communities. Mr. Windhorst thought a ranch house would be more suitable and looked at neighborhoods he thought would suit them. Having not been provided with any of the documentation regarding the sale and purchase of the houses or the modifications made to the ranch house, it is unknown when the actual purchase of the ranch house and those modifications took place. Unfortunately, Ms. Carroll was unable to stay to provide testimony on this issue.

4. On November 8, 2010, Ms. Windhorst went to her routine six month check-up with Dr. Villaroman, at which time routine blood was performed. During that check-up, Ms. Windhorst advised Dr. Villaroman that she stopped taking the Premarin due to leg pain and felt better. She received a pneumonia vaccine on that date.

5. Shortly thereafter, Ms. Windhorst developed Shingles, symptoms of which, in addition to the classic red and painful rash, are fever, headache, and fatigue. The symptoms of Shingles can last for three to five weeks.[9] Ms. Carroll noted in her affidavit that petitioner had Shingles and appeared very sick during Thanksgiving of 2010. Pet. Ex. 56.

6. Sometime in the end of November or early December of 2010, petitioner's ongoing neck problems, and resulting numbness and tingling in her hands and fingers over the years, coupled with carpal tunnel syndrome, worsened. This in turn resulted in progressive weakness in her arms and hands. As a result thereof, petitioner began to drop things and lose the ability to attend to her daily activities. She tried to stay active and continued walking and going to her exercise classes until the end of February of 2011, when while exercising she had an event which apparently exacerbated the already compromised neck problems. This episode resulted in impingement of the spinal cord.

7. On April 7, 2011, petitioner walked into Dr. Harpring's office and had a full neurological examination that found no weakness, pain, or numbness in her legs. Before operating on petitioner's neck, Dr. Harpring ordered extensive pre-surgical testing, including a stress test on a treadmill conducted on May 11, 2011. Petitioner had no problem walking for three minutes and seven seconds on the treadmill and made no complaints at that time about her legs to anyone. There were no contraindications noted for the planned surgery.

8. Petitioner underwent cervical spine surgery on May 16, 2011 with good result. She was kept overnight in the hospital but was medically cleared for discharge the next day. There is no documentation of any weakness in her legs or any problems after surgery noted in that hospital record.

---

[9] National Institute of Health, National Institute on Aging, "Shingles," https://www.nia.nih.gov/health/publication/shingles (last visited Aug. 24, 2016).

9.  On June 1, 2011, at her routine visit with Dr. Villaroman, Ms. Windhorst was noted to be doing well post-cervical spine surgery.  Pet. Ex. 5, p. 246.  However, she complained of right leg pain and weakness in her legs, with the left greater than the right.  *Id.*  She stated she was having difficulty standing.  Despite this, her gait was noted to be stable and her motor strength was 5/5.  Dr. Villaroman ordered a CT scan of her lumbar spine.

10. At a follow up visit with Dr. Harpring, two weeks later on June 15, 2011, and four weeks post cervical surgery, Dr. Harpring noted that petitioner was "doing quite well," though she still experienced "some residual numbness and tingling, mostly in her hands."  Dr. Harpring noted at that time that petitioner mentioned some bilateral lower leg weakness in the left leg, slightly worse than her right with some difficulty getting from a sitting to a standing position.  He further noted that she complained of an inability to walk as far as she used to.  Dr. Harpring noted that there was no complaint of any significant lower extremity pain, numbness and tingling, her complaints related to achiness at night time, only.  An MRI showed L3-4 and L4-5 degenerative spondylosis, mild to moderate right greater than left neuroforaminal narrowing and mild spinal stenosis.

11. On July 7, 2011 at her follow up visit with Dr. Harpring seven weeks post-surgery, the petitioner complained of generalized weakness in the upper and lower extremities, which had progressively gotten worse since her surgery.  She stated that she had difficulty walking "any distance and going up steps due to her weakness."  Dr. Harpring referred her to Dr. Zakaria.

12. Ms. Windhorst was examined by Dr. Zakaria who examined her on July 12, 2011.  Based upon her history, Dr. Zakaria believed petitioner to be suffering from diabetic neuropathy.  He ordered an EMG.  However, several days later, on July 15, 2011, petitioner's condition worsened and she presented to the emergency room at which time Dr. Zakaria saw her again.  Based upon her condition on that date, he ordered a lumbar puncture as well as the previously ordered EMG due to suspected CIDP.  She was discharged home.  The test results confirmed CIDP.  It was at this time that petitioner started using a walker and had the need to support herself while walking.

13. Dr. Zakaria then ordered IVIG treatments.  Over time, however, the IVIG treatments proved unsuccessful and petitioner was sent to the Mayo Clinic for a second opinion.  At this juncture, petitioner has largely resumed her life, though she does still require treatments at regular intervals.

   In reaching these conclusions, I have assigned very little weight to the affidavits and testimony elicited at hearing.  My determination to discount those items was based primarily on the lack of corroboration by the medical records.  The contemporaneous medical records and histories provided by petitioner when seeking medical treatment is far more reliable than the evidence prepared in anticipation of and/or presented after litigation commenced.  I find that petitioner's statements made contemporaneously to her medical providers when seeking medical treatment retain appreciably higher indicia of reliability than the inconsistent statements contained in the affidavits and hearing testimony.

Another factor that weighed heavily in my decision is the following: Given the closeness demonstrated by the Windhorst family, it is unfathomable that if Ms. Windhorst experienced the rapid, dramatic and debilitating decline in health between her trip to Turkey in September of 2010 and the end of February of 2011 as described by petitioner and her family members, that not one family member would have demanded medical intervention.  I find it incredible to believe that if petitioner was holding onto walls, walking with a walker, falling to the floor unable to get up without assistance, unable to care for herself or attend to her daily duties, scooting herself up and down stairs on her bottom from November 2010 onward, and sleeping long amounts of time per day, that her family would have sat idly by and not taken her to an emergency room or for medical intervention.

After careful consideration, and based on the record as a whole, it is clear to me that Ms. Windhorst had progressive ongoing medical problems for years.  However, she did not begin to have symptoms of weakness until, at the earliest, January of 2011, but more likely sometime between her May 16, 2011 cervical surgery and June of 2011.[10]

### III. Conclusion

I find that petitioner did not begin to experience symptoms of CIDP until, at the earliest, January of 2011, but more likely May or June of 2011, some eight months after she received the allegedly causal flu vaccination.  Petitioner is **ordered** to provide a copy of this fact ruling to each of her expert witnesses.  Petitioner's experts **must rely on the facts as I have found them in this Ruling.**  If petitioner's chosen expert witness disagrees with any of my factual findings, he or she must state why with specificity and provide citations to petitioner's medical records that support his or her interpretation.  **Under no circumstances should the expert witness rely upon the facts as described in any of the affidavits filed in this case.**

The following is therefore ORDERED:

**By no later than <u>Monday, November 28, 2016,</u> petitioner must file a status report updating the court on her progress in filing expert report(s) based on the facts as I have found them, and provide the date upon which she expects to file her expert report(s).**  If petitioner is unable secure reports from her expert(s), she must file either a motion to dismiss or a motion for a ruling on the record, both of which will result in the dismissal of her claim.

**IT IS SO ORDERED.**

<u>s/Mindy Michaels Roth</u>
Mindy Michaels Roth
Special Master

---

[10] Though I mention January of 2011, due to some references to that timeframe in the July 2011 medical records, I believe that reference was to the problems with her arms and hands and the necessity for cervical surgery, and not to her legs.